102 Cal.Rptr.2d 719 (2001)
24 Cal.4th 830
14 P.3d 930
APARTMENT ASSOCIATION OF LOS ANGELES COUNTY, INC., et al., Plaintiffs and Appellants,
v.
CITY OF LOS ANGELES, Defendant and Respondent.
No. S082645.
Supreme Court of California.
January 8, 2001.
*720 California Apartment Law Information Foundation, Trevor Grimm and Craig Mordoh, Los Angeles, for Plaintiffs and Appellants.
Sharon L. Browne, Sacramento, and Stephen R. McCutcheon, Jr., for Pacific Legal Foundation as Amicus Curiae on behalf of Plaintiffs and Appellants.
James K. Hahn, City Attorney, Pedro B. Echeverria, Chief Assistant City Attorney, Ronald Tuller, Assistant City Attorney, and Miguel A. Dager, Deputy City Attorney, for Defendant and Respondent.
Hart, King & Coldren, Robert S. Coldren and C. William Dahlin, Santa Ana, for Western Manufactured Housing Communities Association as Amicus Curiae on behalf of Defendant and Respondent.
Gibson, Dunn & Crutcher, James P. Clark, Joel M. Tantalo; Western Center on Law & Poverty, Richard Rothschild; Bet Tzedek Legal Services and Lauren Saunders, Los Angeles, for the Los Angeles Blue Ribbon Citizens' Committee on Slum Housing, Bet Tzedek Legal Services, the Inner City Law Center, Los Angeles Center for Law and Justice, Legal Aid Foundation of Los Angeles, Legal Services of Northern California, Los Angeles Housing Law Project, Public Counsel, San Fernando Valley Neighborhood Legal Services, Western Center on Law and Poverty, Esperanza Community Housing Corporation, Southern California Association of Non Profit Housing, Southern California Mutual Housing Association, the Coalition for Economic Survival, Inquilinos Unidos, the St. Francis Center, the Fair Housing Congress of Southern California and SEIU Local 347 as Amici Curiae on behalf of Defendant and Respondent.
Richard Doyle, City Attorney (San Jose), George Rios, Assistant City Attorney, and Robert Fabela, Deputy City Attorney, for the City of San Jose, the California State Association of Counties and the California Association of Sanitation Agencies as Amici Curiae on behalf of Defendant and Respondent.
MOSK, J.
We granted review to decide whether a city ordinance imposing an inspection fee on private landlords violates article XIII D of the California Constitution (article XIII D), added by initiative measure, Proposition 218, in 1996. We conclude that it does not.
In July 1998, the City of Los Angeles put into effect the Los Angeles Housing Code. It is codified as article 1 of chapter XVI of the Los Angeles Municipal Code (§ 161.101 et seq.). Later that month, plaintiffs sued the city for declaratory and injunctive relief, alleging that Los Angeles Municipal Code section 161.352, imposing an inspection fee on private landlords, is unenforceable because it was enacted without complying with section 6 of article XIII D. The city demurred. The trial court sustained the demurrer without *721 leave to amend, finding that the fee was not subject to the constitutional requirements. It entered judgment for the city.
In its statement of decision, the trial court recognized that the inspection fee "appears arguably to fall within the wide range of assessments which Proposition 218 was apparently written to encompass." But it added, "In Pennell v. City of San Jose (1986) 42 Cal.3d 365, 375[, 228 Cal. Rptr. 726, 721 P.2d 1111], the California Supreme Court held that a fee charged to cover the costs of operating San Jose's rent control ordinances, and not used to raise general revenue, is not subject to Article XIII A of the California Constitution. The City's ordinance here fits squarely within both the reason and rule of Pennell, The ordinance levies only property used for residential apartment rentals, and the money is used only to pay for regulat[ing such] rentals to insure, among other things, that they do not degenerate into what is commonly called `slum conditions.' The assessment is not imposed on all property owners-only a subset of owners who rent apartments."
The Court of Appeal reversed, holding that the state constitutional provision invalidated the city ordinance. The court wrote: "There is nothing in Proposition 218 that exempts regulatory fees imposed on residential rental properties. It thus adds nothing to say, as does the City, that the fees are not `imposed upon property owners in general, but only those who voluntarily engage in the business of renting, generate the risks of slum housing, and specially benefit from regular inspections as they contribute to the overall reputability and safety of the housing provided.' Quite plainly, Proposition 218 applies to any `fee' or `charge,' both of which are defined to mean `any levy other than an ad valorem tax, a special tax, or an assessment, imposed by an agency upon a parcel or upon a person as an incident of property ownership, including a user fee or charge for a property-related service.' (Art. XIII D, § 2, subd. (e). . . .) However well intentioned the City's program to abolish slum housing may be, we find it impossible to say that a fee imposed upon the owners of rental units so the City can locate and eradicate substandard housing is anything other than a user fee or charge for a property-related service." (Italics and fn. omitted.)

I.

A.
Section 161.102 of the Los Angeles Municipal Code states the reason for enacting the Los Angeles Housing Code: "It is found and declared that there exist in the City of Los Angeles substandard and unsanitary residential buildings and dwelling units the physical conditions and characteristics of which render them unfit or unsafe for human occupancy and habitation, and which conditions and characteristics are such as to be detrimental to or jeopardize the health, safety and welfare of their occupants and of the public.
"It is further found and declared that the existence of such substandard buildings as dwelling units threatens the physical, social and economic stability of sound residential buildings and areas, and of their supporting neighborhood facilities and institutions; necessitates disproportionate expenditures of public funds for remedial action; impairs the efficient and economical exercise of governmental powers and functions; and destroys the amenity of residential areas and neighborhoods and of the community as a whole."
Los Angeles Municipal Code section 161.301, entitled Scope, declares that the Los Angeles Housing Code applies to "all residential rental properties with two or more dwelling units on the same lot, the land, buildings and structures appurtenant thereto," but not to owner-occupied units, on-campus dormitory housing, hotels, motels, or certain other types of housing also specifically exempted.
Division 3.5 of the Los Angeles Housing Code (§ 161.351 et seq.) is entitled Housing Inspection Fees. Section 161.351 limits the scope of division 3.5 to "residential *722 rental properties with two or more dwellings subject to the provisions of this Code." Those properties "will be subject to regular inspection by the General Manager or an authorized representative. Inspections may also be complaint-based." (Ibid.)
Section 161.352 of the Los Angeles Municipal Code, at issue here, sets forth the inspection fee schedule. It provides, in its entirety: "Owners of all buildings subject to inspection shall pay a service fee of $12.00 per unit per year. The fee will be used to finance the cost of inspection and enforcement by the Housing Department. Should the owner fail to pay the required fee, the City of Los Angeles will recover it, plus accrued interest, utilizing any remedies provided by law including nuisance abatement or municipal tax lien procedures established by ordinance or state law. This fee shall be known as the `Systematic Code Enforcement Program Fee.'" (Ibid., boldface omitted.)

B.
In November 1996 the voters approved Proposition 218, the Right to Vote on Taxes Act. (Ballot Pamp., Gen. Elec. (Nov. 5, 1996) text of Prop. 218, § 1, p. 108; reprinted as Historical Notes, 2A West's Ann. Cal. Const. (2001 supp.) foll. art. XIII C, § 1, p. 33.) The proposition amended the California Constitution, adding article XIII D. Section 3, subdivision (a)(3) of article XIII D provides that, with certain exceptions not relevant here, "No tax, assessment, fee, or charge shall be assessed by any agency upon any parcel of property or upon any person as an incident of property ownership except: [¶] . . . [¶] . . . as provided by this article." An agency is a local or regional governmental entity. (Id., § 2, subd. (a); Cal. Const., art. XIII C, § 1, subd. (b).)
Section 1 of article XIII D provides that it applies to "all assessments, fees and charges, whether imposed pursuant to state statute or local government charter authority." Fees and charges are defined in subdivision (e) of section 2 thereof. "`Fee' or `charge' means any levy other than an ad valorem tax, a special tax, or an assessment, imposed by an agency upon a parcel or upon a person as an incident of property ownership, including a user fee or charge for a property-related service." (Ibid.)
"Property-related service" is further defined. It "means a public service having a direct relationship to property ownership." (Art. XIII D, § 2, subd. (h).)
Thus, and in summary, article XIII D applies, with certain exceptions not relevant here, to "any levy . . . upon a parcel or upon a person as an incident of property ownership, including a user fee or charge for a property-related service." (Art. XIII D, § 2, subd. (e).) As will appear, the outcome of this case turns on the meaning of this language.

C.
Before us is "a question of law for the appellate courts to decide on independent review of the facts." (Sinclair Paint Co. v. State Bd. of Equalization (1997) 15 Cal.4th 866, 874, 64 Cal.Rptr.2d 447, 937 P.2d 1350.) Though our reasoning turns on the language of the constitutional stricture, it may be helpful to explain, as did the Court of Appeal in Howard Jarvis Taxpayers Assn. v. City of Riverside (1999) 73 Cal.App.4th 679, 86 Cal.Rptr.2d 592 (Howard Jarvis ), the reasons that led to placing Proposition 218 on the ballot.
"Proposition 218 can best be understood against its historical background, which begins in 1978 with the adoption of Proposition 13. `The purpose of Proposition 13 was to cut local property taxes. [Citation.]' [Citation.] Its principal provisions limited ad valorem property taxes to 1 percent of a property's assessed valuation and limited increases in the assessed valuation to 2 percent per year unless and until the property changed hands. (Cal. Const., art. XIII A, §§ 1, 2.)
"To prevent local governments from subverting its limitations, Proposition 13 also prohibited counties, cities, and special *723 districts from enacting any special tax without a two-thirds vote of the electorate. (Cal. Const., art. XIII A, § 4; Rider v. County of San Diego (1991) 1 Cal.4th 1, 6-7, 2 Cal.Rptr.2d 490, 820 P.2d 1000.) It has been held, however, that a special assessment is not a special tax within the meaning of Proposition 13. (Knox v. City of Orland (1992) 4 Cal.4th 132, 141, 14 Cal.Rptr.2d 159, 841 P.2d 144, and cases cited.) Accordingly, a special assessment could be imposed without a two-thirds vote.
"In November 1996, in part to change this rule, the electorate adopted Proposition 218, which added articles XIII C and XIII D to the California Constitution. Proposition 218 allows only four types of local property taxes: (1) an ad valorem property tax; (2) a special tax; (3) an assessment; and (4) a fee or charge. (Cal. Const., art. XIII D, § 3, subd. (a)(l)-(4); see also [id.], § 2, subd. (a).) It buttresses Proposition 13's limitations on ad valorem property taxes and special taxes by placing analogous restrictions on assessments, fees, and charges." (Howard Jams, supra, 73 Cal.App.4th 679, 681-682, 86 Cal. Rptr.2d 592.)

D.
The Court of Appeal explained the parties' differing views of the effect of article XIII D on the city ordinance. "As viewed by [plaintiffs], the fee is imposed `upon a parcel or upon a person as an incident of property ownership' and is, therefore, subject to the procedural requirements of Proposition 218. As viewed by the City, the fee is imposed upon a business activity (the rental of residential dwellings), separate and apart from property ownership, and purely for regulatory purposes, and it is therefore not subject to Proposition 218." (Italics omitted.)
Adhering before us to their point of view, plaintiffs contend that "nothing in Proposition 218 . . . support[s] the contention that [it] was not meant to affect the ability of local governments to impose and collect business `regulatory fees.'" The city also adheres to its position, devoting much of its briefing to an argument that because its inspection fee is a regulatory fee on business operations, it falls outside the purview of article XIII D. Examining the ballot arguments for and against Proposition 218 and the Legislative Analyst's analysis of the measure, the city also contends that article XIII D was intended only to restrict fees imposed directly on property owners in their capacity as such. A regulatory fee imposed on residential rental businesses, the city argues, necessarily falls outside article XIII D's ambit, even if the fee bears some relation to ownership of real property.[1]
As will appear, neither party is entirely correct. The relevant language of article XIII D does not compel a conclusion in plaintiffs' favor; rather, it compels the opposite. The city also misses the mark when it contends (or at least implies) that a regulatory fee or a levy on the operation of a business necessarily falls outside the scope of article XIII D.
But both parties are partly correct. Plaintiffs accurately state that the constitutional provision does not speak of regulatory fees or levies on business operations. Hence, the mere fact that a levy is regulatory (as this inspection fee clearly is) or touches on business activities (as it clearly does) is not enough, by itself, to remove it from article XIII D's scope. But the city is correct that article XIII D only restricts *724 fees imposed directly on property owners in their capacity as such. The inspection fee is not imposed solely because a person owns property. Rather, it is imposed because the property is being rented. It ceases along with the business operation, whether or not ownership remains in the same hands. For that reason, the city must prevail.

II.
Section 2 of Proposition 218 stated the measure's purpose. "The people of the State of California hereby find and declare that Proposition 13 was intended to provide effective tax relief and to require voter approval of tax increases. However, local governments have subjected taxpayers to excessive tax, assessment, fee and charge increases that not only frustrate the purposes of voter approval for tax increases, but also threaten the economic security of all Californians and the California economy itself. This measure protects taxpayers by limiting the methods by which local governments exact revenue from taxpayers without their consent." (Ballot Pamp., Gen. Elec, supra, text of Prop. 218, § 2, p. 108; reprinted as Historical Notes, 2A West's Ann. Cal. Const. supra, foil. art. XIII C, § 1, p. 33.)
The repeated references to taxes and taxpayers suggest an intent to prohibit unratified exactions imposed on property owners as such, rather than on the business of renting or leasing apartmentsi.e., "residential rental properties with two or more dwellings" (L.A.Mun.Code, § 161.351).
As explained in Howard Jarvis, supra, 73 Cal.App.4th 679, 86 Cal.Rptr.2d 592, Proposition 218 is Proposition 13's progeny. Accordingly, it must be construed in that context. (People ex rel. Lungren v. Superior Court (1996) 14 Cal.4th 294, 301, 58 Cal.Rptr.2d 855, 926 P.2d 1042.) Specifically, because Proposition 218 was designed to close government-devised loopholes in Proposition 13, the intent and purpose of the latter informs our interpretation of the former. Proposition 13 was directed at taxes imposed on property owners, in particular homeowners. The text of Proposition 218, the ballot arguments (both in favor and against), the Legislative Analyst's analysis, and the annotations of the Howard Jarvis Taxpayers Association, which drafted Proposition 218, all focus on exactions, whether they are called taxes, fees, or charges, that are directly associated with property ownership.
The Legislative Analyst's analysis, printed in the November 1996 ballot pamphlet, is illustrative. It explained that Proposition 218 "would constrain local governments' ability to impose fees, assessments, and taxes," meaning "property-related" fees, including fees for water, sewer and refuse collection, but excluding gas and electricity charges (see Cal. Const., art. XIII D, § 3, subd.(b)) and development fees (see id., § 1, subd.(b)). (Ballot Pamp., Gen. Elec, supra, Legis. Analyst's analysis, p. 73.) It did not refer to levies linked more indirectly to property ownership.
The ballot arguments for Proposition 218 are also illustrative. "Proposition 218 guarantees your right to vote on local tax increases-even when they are called something else, like `assessments' or `fees' and imposed on homeowners." (Ballot Pamp., Gen. Elec, supra, argument in favor of Prop. 218, p. 76.) "After voters passed Proposition 13, politicians created a loophole in the law that allows them to raise taxes without voter approval by calling taxes `assessments' and `fees.'" (Ibid.) "There are now over 5,000 local districts which can impose fees and assessments without the consent of local voters. Special districts have increased assessments by over 2400% over 15 years. Likewise, cities have increased utility taxes 415% and raised benefit assessments 976%, a ten-fold increase." (Ibid.) "To confirm the impact of fees and assessments on you, look at your property tax bill. You will see a growing list of assessments imposed without voter approval. The list will grow even longer unless Proposition 218 passes." (Ibid.)
*725 The ballot arguments identify what was perhaps the drafter's main concern: tax increases disguised via euphemistic relabeling as "fees," "charges," or "assessments." But in fairness to plaintiffs, it cannot be denied that the text of article XIII D does not limit its scope to taxes and taxpayers. We turn to the definitive language: restrictions on any levy imposed "upon a parcel or upon a person as an incident of property ownership." (Art. XIII D, § 2, subd. (e).)
The foregoing language means that a levy may not be imposed on a property owner as suchi.e., in its capacity as property ownerunless it meets constitutional prerequisites. In this case, however, the fee is imposed on landlords not in their capacity as landowners, but in their capacity as business owners. The exaction at issue here is more in the nature of a fee for a business license than a charge against property. It is imposed only on those landowners who choose to engage in the residential rental business, and only while they are operating the business.
The contrary reasoning of the Court of Appeal, and of plaintiffs, stems from a reliance on the word "incident," leaving aside that the constitutional provision does not refer to fees imposed on an incident of property ownership, but on a parcel or a person as an incident of property ownership. As amicus curiae for the city persuasively argue, the distinction is crucial.
Were the principal words parcel and person missing, and were as replaced with on, so that article XIII D restricted the city's ability to impose fees "on an incident of property ownership," plaintiffs' argument might have merit. For among the incidents[2] of estates in land are the socalled bundle of rights that flow from such tenure. (31 C.J.S. (1996) Estates § 12, pp. 28-30; id., § 14, pp. 32, 34; id., § 31, p. 58.) Among them is the fundamental right to alienate one's property held in fee simple. (E.g., id., § 12, p. 30; Holien v. Trydahl (N.D.1965) 134 N.W.2d 851, 856; Davis v. Geyer (1942) 151 Fla. 362, 369, 9 So.2d 727, 728; Hardy v. Galloway (1892) 111 N.C. 519, 523, 15 S.E. 890; see also Yee v. City of Escondido (1992) 503 U.S. 519, 528, 112 S.Ct. 1522, 118 L.Ed.2d 153.) That incident, or right, has been called "inseparable" (Holien, supra, 134 N.W.2d at p. 856; Hardy, supra, 15 S.E. at p. 890), "indispensable" (Dukes v. Crumpton (1958) 233 Miss. 611, 620, 103 So.2d 385, 388), and "necessary" (Re Collier (Nfld.1966) 60 D.L.R.2d 70, 75 [52 M.P .R. 211, 216] (per Puddester, J.)).
*726 The power to alienate property or a property right is not limited to the right to sell or assign it. It means generally the power "to transfer or convey [it] to another." (Black's Law Diet., supra, p. 73, col. 1.) The conveyance need not be the whole fee. The right of alienation applies when fee holders seek to convey lesser estates.[3] "`[T]he power or right of alienation' " "`incident to the ownership of an estate in fee-simple'" "`include[s] the power or right to dispose of property held in fee . . . by lease, mortgage, or other mode of conveyance. . . .'" (Porter v. Barrett (1925) 233 Mich. 373, 379-380, 206 N.W. 532, 535, quoting Manierre v. Welling (1911) 32 R.I. 104, 140, 78 A. 507, 522, italics added here.)
Accordingly, if article XIII D restricted the city's ability to impose a "tax, assessment, fee, or charge on an incident of property ownership" (cf. id., §§2, subd. (e), 3), plaintiffs' argument might be persuasive. The business of renting apartments is an incident of owning them, an activity necessarily dependent on that ownership but not vice versa. One can own apartments without renting them, but no one can rent them without owning them. (See fn. 2, ante, 102 Cal.Rptr.2d at p. 725, 14 P.3d at p. 936.)[4]
But the language of article XIII D is materially dissimilar. As stated, article XIII D, section 3 provides that "[n]o tax, assessment, fee, or charge [shall be assessed by any agency upon any parcel of *727 property or upon any person as an incident of property ownership except . . . [¶] . . . [¶] . . . as provided by this article." (See also id., § 2, subd. (e).) In other words, taxes, assessments, fees, and charges are subject to the constitutional strictures when they burden landowners as landowners. The ordinance does not do so: it imposes a fee on its subjects by virtue of their ownership of a businessi.e., because they are landlords.[5] What plaintiffs ask us to do is to alter the foregoing language-changing "as an incident of property ownership" to "on an incident of property ownership." But to do so would be to ignore its plain meaning-namely, that it applies only to exactions levied solely by virtue of property ownership. We may not interpret article XIII D as if it had been rewritten. (Accord, People ex rel Lungren v. Superior Court, supra, 14 Cal.4th 294, 301, 58 Cal.Rptr.2d 855, 926 P.2d 1042.)
The language of article XIII D, sections 2, subdivision (e), and 3, shows that it applies to levies imposed on a person or on property strictly as an incident of property ownership. Had the law included levies imposed on incidents of the ownership or use of residential real property (as rele vant here, the exercise of the right to rent one's property), its text would have said so. But it did not. And although the plain language of the relevant constitutional provisions requires us not to consider extrinsic evidence of the voters' intent, we reiterate, purely as an aside, that neither the ballot arguments nor the Legislative Analyst's analysis suggested that article XIII D was intended to encompass fees of the type at issue here.
The subordinate clause in section 2, subdivision (e), of article XIII D, as clarified in section 2, subdivision (h), supports our conclusion. It may be recalled that among the fees or charges covered by article XIII D, section 2, subdivision (e), is "a user fee or charge for a property-related service." Such a service "means a public service having a direct relationship to property ownership." (Id., § 2, subd. (h).) In this case, the relationship between the city's inspection fee and property ownership is indirectit is overlain by the requirement that the landowner be a landlord.
As stated, the foregoing clause is subordinate. It does not include all possible fees and charges that fall within the ambit of article XIII D. But it does provide additional evidence of the scope of the constitutional provision.[6]
*728 At oral argument, plaintiffs emphasized article XIII D's exemptions for existing development fees and all charges to provide gas and electrical service. (Art. XIII D, §§ 1, subd. (b), 3, subd. (b).) They assert that a developer fee is a fee on an incident of propertythe right to improve itand that there would have been no need to exempt such fees if other fees imposed on incidents of property did not fall within article XIII D's scope. Similarly, they argue that one can own property without having utility service, and that if article XIII D applied strictly to levies that are imposed solely on the basis of property ownership, there would have been no need to exempt such utility charges in the constitutional provision.
We note, however, that the provision regarding development fees refers only to those existing at the time of article XIII D's enactment. Moreover, it is unclear to us whether a fee to provide gas or electricity service is the same as a fee imposed on the consumption of electricity or gas. In any event, we believe that the aforementioned exemptions may have been included in an abundance of caution in case court interpretations of article XIII D similar to the Court of Appeal's should prevail. Finally, we do not believe that any incongruity can trump the plain language we have discussed herein. In short, we are unpersuaded.
Similarly unpersuasive is plaintiffs' contention, also emphasized at oral argument, that the city's ability to enforce payment of the inspection fee by imposing a lien on the property shows that the fee is property-related, not business-related. The fact is that the city is simply availing itself of all possible means to collect the fee. Property liens may be precipitated by at least one cause unconnected to land ownership (except ownership of the land on which the lien is imposed): the cost of removing graffiti. (Gov.Code, § 38772.) A lien may be imposed on parents' land to defray the cost of removing graffiti their child has scrawled on that belonging to another. (Id., subd. (b).)
Plaintiffs also advert to section 5 of Proposition 218, which requires that "[t]he provisions of this act shall be liberally construed to effectuate its purposes of limiting local government revenue and enhancing taxpayer consent." (Ballot Pamp., Gen. Elec, supra, text of Prop. 218, § 5, p. 109; reprinted as Historical Notes, 2A West's Ann. Cal. Const., supra, foil. art. XIII C, p. 33.) But "[l]iberal construction cannot overcome the plain language of Proposition 218 limiting [its] scope . . . to [levies] based on real property." (Howard Jarvis Taxpayers Assn. v. City of San Diego (1999) 72 Cal.App.4th 230, 237-238, 84 Cal.Rptr.2d 804.) As a rule, a command that a constitutional provision or a statute be liberally construed "does not license either enlargement or restriction of its evident meaning" (People v. Cruz (1974) 12 Cal.3d 562, 566, 116 Cal.Rptr. 242, 526 P.2d 250). Thus given that article XIII D's scope is, as we have explained, unambiguously limited to burdens on landowners as such, "`no resort to this command [of liberal construction] is required'" (Howard Jarvis, supra, 73 Cal.App.4th 679, 687, 86 Cal.Rptr.2d 592, quoting Buhlert Trucking v. Workers' Comp. Appeals *729 Bd. (1988) 199 Cal.App.3d 1530, 1533, fn. 4, 247 Cal.Rptr. 190) or even permitted.

III.
The Court of Appeal's judgment is reversed.
GEORGE, C.J., KENNARD, J., WERDEGAR, J. and CHIN, J., concur.
Dissenting Opinion by BROWN, J.
I respectfully dissent.
Under the provisions of Proposition 218, affected property owners must approve the imposition of any new or increased fee, which is "any levy other than an ad valorem tax, a special tax, or an assessment, imposed by an agency upon a parcel or upon a person as an incident of property ownership, including a user fee or charge for a property-related service." (Cal. Const., art. XIII D, § 2, subd. (e) (article XIII D).) The dispositive determination in this case is whether a rental inspection fee is imposed "upon a person as an incident of property ownership." (Ibid.) To find that it is not, the majority concludes the Court of Appeal erroneously substituted "on" for "as." It is the majority that errs, however, in assuming "incident" denotes "the so-called bundle of rights that flow from [estates in land]." (Maj. opn., ante, p. 725, 14 P.3d at p. 936; see maj. opn., ante, pp. 725-726, 14 P.3d at pp. 936-937.) In my view, the voters did not intend the courts to look any further than a standard dictionary in applying the terms of article XIII D.
"A constitutional amendment should be construed in accordance with the natural and ordinary meaning of its words. [Citation.]" (Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization (1978) 22 Cal.3d 208, 245, 149 Cal.Rptr. 239, 583 P.2d 1281; People ex rel. Lungren v. Superior Court (1996) 14 Cal.4th 294, 302, 58 Cal.Rptr.2d 855, 926 P.2d 1042.) Nothing in the ballot arguments in favor of or against Proposition 218 or in the Legislative Analyst's analysis implies that a different rule should obtain with respect to "incident," or that the voters intended it to have other than a plain meaning. The dictionary defines an "incident" as "something incident to something else," that is, "dependent upon or involved in something else." (Webster's New World Diet. (3d college ed.1988) p. 682; see also Black's Law Diet. (4th ed.1968) p. 904, col. 2 ["Used as a noun, [incident] denotes anything which inseparably belongs to, or is connected with, or inherent in, another thing. . . . Also, less strictly, it denotes anything which is usually connected with another, or connected for some purposes, though not inseparably"].) In other words, if the imposition of a fee depends upon one's ownership of property, it comes within the purview of article XIII D unless otherwise excepted.
The fee at issue here plainly meets this definition. Pursuant to its police powers, the City of Los Angeles (City) enacted a Housing Code (L.A.Mun.Code, § 161.101 et seq.), which provides that residential rental properties are subject to regular inspection for substandard and unsanitary conditions. Under the Housing Code, funding for these inspections devolves to a particular class of property owners, the landlords of the rental units, who must pay a $12 fee for every unit owned. (Id., § 161.352.)[1] As the majority acknowledges, "no one can rent [apartments] without owning them." (Maj. opn., ante, 102 Cal.Rptr.2d at p. 726, 14 P.3d at p. 937; see also Nash v. City of Santa Monica (1984) 37 Cal.3d 97, 105, 207 Cal.Rptr. 285, 688 P.2d 894.) And no one is subject to *730 the rental inspection fee without owning them. This exaction is thus imposed "as an incident of property ownership" (art. XIII D, § 2, subd. (e)); that is, it is dependent upon such ownership. (Cf. Off. of Legis. Analyst, Understanding Proposition 218 (Dec.1996) p. 30 ["Generally, we think these fees would be considered property-related if there were no practical way that the owner could avoid the fee, short of selling the property or fundamentally changing its use"].) Moreover, "[s]hould the owner fail to pay the required fee, the City of Los Angeles will recover it, plus accrued interest, utilizing any remedies provided by law including nuisance abatement or municipal tax lien procedures established by ordinance or state law." (L.A.Mun.Code, § 161.352.) The use of tax lien procedures is a typical enforcement mechanism for delinquent levies imposed against property.
The majority avoids this result in part by finding the City "imposes a fee on its subjects by virtue of their ownership of a businessi.e., because they are landlords." (Maj. opn., ante, 102 Cal.Rptr.2d p. 938, 14 P.3d p. 727.) The last portion of this statement proves too much: Landlords are property owners. Imposition of the fee is an incident of, i.e., depends upon, that status and thereby runs afoul of article XIII D. As for the first portion of the statement, it ignores or disregards what the majority elsewhere concedes, that the business at issue is inseparable from property ownership. No amount of parsing can change that ineluctable fact.
The majority also concludes "neither the ballot arguments nor the Legislative Analyst's analysis suggested that article XIII D was intended to encompass fees of the type at issue here." (Maj. opn., ante, p. 727, 14 P.3d p. 938.) Ultimately, the terms of the measure as enacted control our interpretation (see Kopp v. Fair Pol. Practices Com. (1995) 11 Cal.4th 607, 673, 47 Cal.Rptr.2d 108, 905 P.2d 1248 (cone, opn. of Mosk, J.)); and their plain meaning does not support the majority's reasoning. But the ballot materials also belie the majority's conclusion. While those materials do not specifically mention rental inspection fees, such an intention is readily discernable from any fair reading. The Legislative Analyst warned generally that "[t]his measure would constrain local governments' ability to impose fees" and "[r]educe the amount of fees . . . businesses pay." (Ballot Pamp., Gen. Elec. (Nov. 5, 1996), analysis of Prop. 218 by the Legis. Analyst, p. 73 (Ballot Pamphlet).) More particularly, the Legislative Analyst's list of "most likely fees and assessments affected by these provisions" (id. at p. 74) easily encompasses this type of exaction: "park and recreation programs, fire protection, lighting, ambulance, business improvement programs, library, and water service." (Ibid.) The argument in favor of Proposition 218 reminded the electorate that "[a]fter voters passed Proposition 13, politicians created a loophole in the law that allows them to raise taxes without voter approval by calling taxes `assessments' and `fees.'" (Ballot Pamp., supra, argument in favor of Prop. 218, p. 76.) "Proposition 218 guarantees your right to vote on local tax increaseseven when they are called something else, like `assessments' or `fees'. . . ." (Ibid.) The argument did not limit the type of "fee" that would be subject to a vote under article XIII D but instead promised, "Proposition 218 . . . stops politicians' end-runs around Proposition 13." (Ballot Pamp., supra, rebuttal to argument against Prop. 218, p. 77.) Particularly in light of its timing, the City's rental inspection fee appears to be just the kind of evasive maneuver at which proponents aimed Proposition 218. (See generally Huntington Park Redevelopment Agency v. Martin (1985) 38 Cal.3d 100, 105, 211 Cal.Rptr. 133, 695 P.2d 220 [purpose, in part, of Prop. 13 was "to prevent the government from recouping its losses from decreased property taxes by imposing or increasing other taxes"].)
In this regard, the majority also fails to accord any significance to two important provisions of Proposition 218. In any action challenging imposition of a new or *731 increased fee or charge, the initiative assigns to the agency "the burden . . . to demonstrate compliance with this article" (art. XIII D, § 6, subd. (b)(5)), thereby reversing the usual deference accorded governmental action in such matters and making it more difficult to defend its legitimacy. (See Ballot Pamp., supra, analysis of Prop. 218 by the Legis. Analyst, p. 74; see also art. XIII D, § 4, subd. (f) [imposing same burden for assessments].) The voters also expressly provided that Proposition 218 "shall be liberally construed to effectuate its purposes of limiting local government revenue and enhancing taxpayer consent." (Ballot Pamp., supra, text of Prop. 218, § 5, p. 109, also reprinted as Historical Notes, 2A West's Ann. Cal. Const. (2000 supp.) foll. art. XIII C, § 1, p. 25.) The majority's construction frustrates both these goals.
The City argues that conditioning imposition of its rental inspection fee on compliance with the procedures set forth in article XIII D would allow landlords to defeat regulation of their businesses. This argument misses two critical points: First and generally, since the City has decided its rental inspections are necessary to eradicate "substandard and unsanitary residential buildings and dwelling units the physical conditions and characteristics of which . . . are such as to be detrimental to or jeopardize the health, safety and welfare of their occupants and of the public" (L.A.Mun.Code, § 161.102), it can reasonably expect the public to pay for the program.
Second and specifically, the Los Angeles Municipal Code already provides substantial enforcement authority to prosecute landlords who violate the City's Housing Code. If a property owner fails to correct violations, the City may recover its administrative as well as abatement costs (L.A.Mun.Code, § 161.206.2), may seek criminal penalties including fines and imprisonment (id, § 161.206.3), and may pursue civil remedies as provided in the Health and Safety Code (L.A.Mun.Code, § 161.206.4).
When the voters passed Proposition 13 in 1978, they sought to restrict the ability of government to impose taxes and other charges on property owners without their approval. For almost two decades, however, they witnessed politicians evade this constitutional limitation. The message of Proposition 218 is that they meant what they said. With the majority turning a deaf ear to that message, we may well expect a future effort to "stop[ ] politicians' end-runs around Proposition 13." (Ballot Pamp., supra, rebuttal to argument against Prop. 218, p. 77.)
BAXTER, J., concurs.
NOTES
[1] We have also received several amicus curiae briefs. Along with one of them is a request to judicially notice three purported local mobile-home park rent control ordinances and two other documents regarding that topic. The request is denied. The five documents have no bearing on the question before us.

Amici curiae also include a printed discussion issued by the Legislative Analyst in December 1996 and entitled Understanding Proposition 218. This document contains material relevant to the question at bench, and we grant the request for judicial notice regarding it. (Evid.Code, §§ 452, subd. (c), 459, subd. (a).)
[2] Over time, "incident" has meant many things. As a noun, the meanings include the burden of the risk of a diminution of the value of real property during condemnation proceedings (Agins v. City of Tiburon (1980) 447 U.S. 255, 263, fn. 9, 100 S.Ct. 2138, 65 L.Ed.2d 106), the "`burdens and disabilities' " of slavery prohibited by the Thirteenth Amendment to the United States Constitution (Jones v. Mayer Co. (1968) 392 U.S. 409, 441, 88 S.Ct. 2186, 20 L.Ed.2d 1189), or. in earlier times, the monetary obligations imposed by the king or a mesne lord (McPherson, Revisiting the Manor of East Greenwich (1998) 42 Am. J. Legal Hist. 35, 39; see also 2 Coke (1641) Institutes of the Lawes of England (Butler & Hargrave's Notes ed.) 69a, § 95, fn. 7). And, in a more general sense, the meanings of "incident" include benefits or duties that appertain to some greater right or interest, i.e., the principal. (Civ.Code, §§ 662, 1084, 3540; Owsley v. Hamner (1951) 36 Cal.2d 710, 716-717, 227 P.2d 263; Fender v. Waller (1941) 139 Neb. 612, 616, 298 N.W. 349, 351; Harris v. Elliott (1836) 35 U.S. (10 Pet.) 25, 54, 9 L.Ed. 333.) In its fourth edition (1897), Bouvier's Law Dictionary defined "incident" as a term "used both substantively and adjectively of a thing which, either usually or naturally and inseparably depends upon, appertains to, or follows another that is more worthy. For example, . . . the right of alienation is necessarily incident to a fee-simple at common law. . ." (Id. at p. 1006, col. 1.) Many cases have followed the Bouvier's Law Dictionary definition, or ones similar to it. (E.g., Watts v. Copeland (1933) 170 S.C. 449, 452, 170 S.E. 780; Moccasin State Bank v. Waldron (1928) 81 Mont. 579, 586, 264 P. 940.) "Thus, timber trees are incident to the freehold, and so is a right of way." (In re Estate of Bellesheim (1888) 1 N.Y.S. 276, 278 [dictum]; accord, Harris v. Elliott, supra, 35 U.S. (10 Pet.) at p. 54 [easements]; Black's Law Diet. (7th ed.1999) p. 765, col. 1 ["the utility easement is incident to the ownership of the tract"].)
[3] It is, of course, axiomatic in Anglo American law that ownership of real property in fee simple absolute is the greatest possible estate (1 Coke (1628) Institutes of the Lawes of England (Butler & Hargrave's Notes ed.) 18a, § 11), and among the panoply of lesser estates are such nonfreehold chattels real as leases for a specific term and periodic tenancies (Pacific Southwest Realty Co. v. County of Los Angeles (1991) 1 Cal.4th 155, 162, 2 Cal. Rptr.2d 536, 820 P.2d 1046)in common parlance, rentals or leases of limited duration. (1 Tiffany, The Law of Real Property (3d ed.1939) § 76, pp. 112-113; Wilgus v. Commonwealth (1873) 72 Ky. (9 Bush.) 556, 557, 1873 WL 6660, citing 2 Blackstone, Commentaries * 143 ["`An estate for years in land is regarded in law as inferior to an estate for life or an inheritance'"]; Brydges v. Millionair Club (1942) 15 Wash.2d 714, 719 [132 P.2d 188, 190]; see also Williams v. R.R. (1921) 182 N.C. 267, 272, 108 S.E. 915, 918.)
[4] In Acme Freight Lines Inc. v. Vidalia (1942) 193 Ga. 334, 18 S.E.2d 540 (Acme Freight ), similar statutory language favored an analogous argumentthat a tax on an incident of the trucking business was a lax on a trucking company's ancillary delivery business.

In Acme Freight, a trucking company sought an injunction against a city's practice of imposing a business tax on those ancillary operations. The firm relied on this law: "No subdivision of this State . . . shall levy any excise, license, or occupation tax of any nature on . . . any incidents of said motor carrier business, or on a motor common carrier." (Acme Freight, supra, 193 Ga. 334, 335, 18 S.E.2d 540, 541, italics added.)
The city, Vidalia, acknowledged "its lack of authority to levy any tax against the plaintiff in reference to its transportation of freight as a motor common carrier. . . . Justification for the tax is founded upon the fact that, in addition to the operation of trucks for the transportation of freight . . ., the plaintiff carries on . . . a `pick-up and delivery service' in and around the city. The trial judge ruled that this `is not a necessary incident to the operation of a common carrier,' and that as to it `the plaintiff is not a motor common carrier, but is engaged in a special and distinct business in the City of Vidalia, and is taxable as such.' This formula interpolates before the word `incidents,' used in the statute, the word `necessary' so as to require, as a condition of tax immunity, that the operation be a necessary incident of the business of a motor common carrier. This appears to us to be erroneous. [Rather,] . . . an incident of the business of a motor common carrier of freight would be something naturally associated as pertinent to such transportation and necessarily dependent upon it, but without which the business of transportation might nevertheless be carried on. In other words, the incidental operation would be necessarily dependent upon the transportation, but the business of transportation would not be necessarily dependent upon the incidental operation. . . . As we understand the evidence adduced in this case, the plaintiff's operations against which the tax is said to be levied is of the abovedescribed character; and accordingly we conclude that the tax is illegal, and should have been enjoined." (Acme Freight, supra, 193 Ga. 334, 335-336, 18 S.E.2d 540, 541.)
[5] We acknowledge that landlords may rent because they wish to keep the property occupied in their absence, for philanthropic reasons, or to a family member for a nominal charge. Such arrangements are not rare, and may lie within the province of the ordinance, which refers to "residential rental properties." But even nonprofit or charitable purposes are business purposes under broad constructions of the term, and we believe that as long as the property is being rented for consideration, it is being conveyed for a business purpose. (Cf. Marin Municipal Water Dist. v. Chenu (1922) 188 Cal. 734, 738, 207 P. 251 ["`business'" has "a narrower meaning applicable to occupation or employment for livelihood or gain, and to mercantile or commercial enterprises or transactions"].)
[6] We turn to discuss briefly the authorities on which the city chiefly relies. They consist of two cases: Sinclair Paint Co. v. State Bd. of Equalization, supra, 15 Cal.4th 866, 64 Cal. Rptr.2d 447, 937 P.2d 1350; and Pennell v. City of San Jose (1986) 42 Cal.3d 365, 228 Cal.Rptr. 726, 721 P.2d 1111 (affd. sub nom. Pennell v. San Jose (1988) 485 U.S. 1, 108 S.Ct. 849, 99 L.Ed.2d 1). They are inapposite.

In Sinclair we held that an exaction on sources of lead contamination to remediate the effects of lead poisoning was a fee, not a tax. In Pennell. we held that a $3.75 charge on each residential rental unit, imposed by a rent control ordinance to fund its hearing process, also was a fee, not a tax. In Sinclair and Pennell, we defined such fees, which are similar to the city's inspection charge, as regulatory in nature. Regulatory fees are those "charged in connection with regulatory activities[,] which fees do not exceed the reasonable cost of providing services necessary to the activity for which the fee is charged and which are not levied for unrelated revenue purposes."'" (Sinclair Paint Co. v. State Bd. of Equalization, supra, 15 Cal.4th 866, 876, 64 Cal.Rptr.2d 447, 937 P.2d 1350, quoting Pennell v. City of San Jose, supra, 42 Cal.3d 365, 375, 228 Cal.Rptr. 726, 721 P.2d 1111, in turn quoting Mills v. County of Trinity (1980) 108 Cal.App.3d 656, 659-660, 166 Cal.Rptr. 674, bracketed material added here.)
We have stated that the city's inspection fee is a regulatory fee. And we have concluded that it does not fall within article XIII D's ambit. But Sinclair and Pennell do not concern themselves with the issue we confront here. Indeed, in Sinclair we cautioned that "We are not here concerned with issues arising under constitutional amendments effected by a recent initiative measure (Proposition 218) adopted at the November 5, 1996, General Election. That measure contains new restrictions on local agencies' power to impose fees and assessments." (Sinclair Paint Co. v. State Bd. of Equalization, supra, 15 Cal.4th 866, 873, fn. 2, 64 Cal.Rptr.2d 447, 937 P.2d 1350.) In Pennell v. City of San Jose, supra, 42 Cal.3d 365, 228 Cal.Rptr. 726, 721 P.2d 1111, we could not have written a similar caveat, for article XIII D did not exist at the time. But it applies just as well.
[1] Los Angeles Municipal Code section 161.352 provides: "Owners of all buildings subject to inspection shall pay a service fee of $12.00 per unit per year. The fee will be used to finance the cost of inspection and enforcement by the Housing Department. Should the owner fail to pay the required fee, the City of Los Angeles will recover it, plus accrued interest, utilizing any remedies provided by law including nuisance abatement or municipal tax lien procedures established by ordinance or stale law. This fee shall be known as the `Systematic Code Enforcement Program Fee.'" (Italics added.)