Filed 8/1/14

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CITY OF SAN DIEGO,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MELVIN SHAPIRO et al.,<br><br>    Defendants and Appellants. | D063997<br><br><br><br>(Super. Ct. No.<br> 37-2012-00097148-CU-MC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Ronald S. Prager, Judge.  Reversed and remanded with directions.

Law Office of Craig A. Sherman and Craig A. Sherman for Defendant and Appellant Melvin Shapiro.

Briggs Law Corporation, Cory J. Briggs, Mekaela M. Gladden, and Anthony N. Kim for Defendant and Appellant San Diegans for Open Government.

Jan I. Goldsmith, City Attorney, Donald R. Worley, Assistant City Attorney, Michael Travis Phelps and Glenn Spitzer, Deputy City Attorneys; Orrick Herrington & Sutcliffe, Michael C. Weed and Daniel C. Bort, for Plaintiff and Respondent City of San Diego.

INTRODUCTION

In 1978, California voters enacted Proposition 13, which amended the California Constitution by adding article XIII A (article XIII A).  The amendment "plac[ed] significant limits on the taxing power of local and state governments."  (*State Building & Construction Trades Council of California v. City of Vista* (2012) 54 Cal.4th 547, 562, fn. 3.)  As pertinent here, article XIII A, section 4 provides, "Cities, Counties and special districts, by a two-thirds vote of the *qualified electors of such district*, may impose special taxes on such district . . . ."  (Italics added.)

In 1996, California voters enacted Proposition 218, which added article XIII C (article XIII C) and article XIII D (article XIII D) to the California Constitution in order to "close government-devised loopholes in Proposition 13."  (*Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2001) 24 Cal.4th 830, 839 (*Apartment Assn. of Los Angeles County, Inc.*)  Article XIII C, section 2, subdivision (d) provides, "No local government may impose, extend, or increase any special tax unless and until that tax is submitted to the *electorate* and approved by a two-thirds vote."  (Italics added.)

In this appeal, we must determine whether an election held by the City of San Diego (the City) to authorize the levying of a special tax complied with these provisions of the California Constitution.  In the election at issue, the City did not permit the City's registered voters to vote on the special tax.  Instead, the City passed an ordinance that specifically defined the electorate to consist solely of (1) the owners of real property in

the City on which a hotel is located, and (2) the lessees of real property owned by a governmental entity on which a hotel is located.

We conclude that the election was invalid under the California Constitution because such landowners and lessees are neither "qualified electors" of the City for purposes of article XIII A, section 4 (see *Neilson v. City of California City* (2005) 133 Cal.App.4th 1296, 1313 (*Neilson*) ["the term 'qualified electors' means registered voters," quoting art. XIII A, § 4]), nor do they comprise a proper "electorate" under article XIII C, section 2, subdivision (d).  (See *Greene v. Marin County Flood Control and Water Conservation Dist.* (2010) 49 Cal.4th 277, 297 (*Greene*) ["[E]lections pertaining to special . . . taxes in article XIII C, section 2, do not permit property qualifications"].)

We further conclude that the election was invalid under the San Diego City Charter (City Charter) because City Charter section 76.1 (section 76.1) requires the approval of two-thirds of the "qualified electors" voting in an election on a special tax, and section 6 of the City Charter (section 6) defines "[q]ualified [e]lectors" as those persons who are registered to vote in general state elections under state law. Accordingly, we reverse the trial court's judgment validating the special tax and remand the matter to the trial court with directions to enter judgment against the City.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Convention Center Facilities District*

The San Diego City Council (the City Council) passed an ordinance enacting a new division of the San Diego Municipal Code (the Division) in November 2011.  (San Diego Mun. Code, ch. 6, art. 1, div. 27.)  The Division authorizes the City to form a Convention Center Facilities District (CCFD) in order to help finance the potential expansion of the San Diego Convention Center through the imposition of a special tax. The ordinance explains that the CCFD would "compris[e] the entire City," but that only hotels within the CCFD "would be subject to [the] special tax," which would be "based upon a percentage of room revenues."  (San Diego Ord. No. 20106.)

The Division incorporates and modifies numerous provisions of the Mello-Roos Community Facilities Act of 1982 (Gov. Code, § 53311 et seq.)[1] (Mello-Roos Act), including portions of various "election procedures" (San Diego Mun. Code, § 61.2710) specified in the Mello-Roos Act as necessary to authorize the imposition of a special tax. The Mello-Roos Act special tax election procedures are defined in section 53326 and provide in relevant part:

> "(a) The legislative body shall . . . submit the levy of any special taxes to the qualified electors of the proposed community facilities district or to the qualified electors of the territory to be annexed by

----

[1]    All subsequent statutory references are to the Government Code, unless otherwise specified.

4

the community facilities district in the next general election or in a special election . . . .

"[¶] . . . . [¶]

"(c) If the proposed special tax will not be apportioned in any tax year on any portion of property in residential use in that tax year, as determined by the legislative body, the legislative body may provide that the vote shall be by the landowners of the proposed district whose property would be subject to the tax if it were levied at the time of the election.  Each of these landowners shall have one vote for each acre, or portion thereof, that the landowner owns within the proposed district that would be subject to the proposed tax if it were levied at the time of the election."

The Division incorporates and modifies the election procedures of the Mello-Roos

Act as follows:

"All election procedures set forth in the [Mello-Roos Act] shall apply to this Division with the following exceptions:

"(a) The qualified electors shall in all cases be the *Landowners.*

"(b) The City Clerk shall in all cases be the elections official.

"(c) Votes shall not be allocated on the basis of acreage of real property but instead shall be allocated to each *Landowner* on the basis of one vote for each dollar of special tax that would have been the obligation of that parcel as determined by the City Council if the proposed special tax had been in place for the 12-month period ending at the end of the month which is three months prior to the month in which the resolution calling the special mailed-ballot election is adopted by the City Council."  (San Diego Mun. Code, § 61.2710.)

5

The Division defines Landowner as follows: "*Landowner* means the owner of the real property upon which a *Hotel*[2] is located except that if the fee owner of the real property is a government entity, *Landowner* means the lessee of the government entity." (San Diego Mun. Code, § 61.2705.)

The Division further provides, "Any special tax imposed pursuant to this Division shall be levied on the property for use of the property as a *Hotel* (or, as the case may be, levied on the leasehold interest of a publicly-owned *Hotel* parcel). The special tax shall not, in any year, be levied on the residential use of the property for that year. *Hotel* use is not residential use." (San Diego Mun. Code, § 61.2712.)

The City Council passed a Resolution of Formation in January 2012, through which the City finalized the proposal to finance the CCFD. (San Diego Res. No. 307243.) The Resolution of Formation incorporates a rate and method of apportionment (RMA) of the proposed special tax to be levied upon eligible taxable parcels within the CCFD. (*Ibid.*) The RMA provides that the special tax would be calculated based on a percentage of hotel room revenues at one of three different rates, depending on the hotel's geographic location. (*Ibid.*) Hotels in the downtown area would pay three percent of

---

2    The Division defines "*Hotel*" as having the same meaning as provided in San Diego Municipal Code section 35.0102. (San Diego Mun. Code, § 61.2705.) San Diego Municipal Code section 35.0102 provides: " 'Hotel' means any structure or any portion of any structure which is occupied, or intended or designed for occupancy, by transients for dwelling, lodging, or sleeping purposes, and is held out as such to the public. 'Hotel' does not mean any hospital, convalescent home, or sanitarium." (*Ibid.*)

6

room revenues, while those in other areas would pay either one or two percent of their room revenues.  (*Ibid*.)

Also in January 2012, the City Council passed a resolution proposing that the CCFD authorize the City to issue up to $575 million in bonds to be repaid by special tax revenues levied in the CCFD.  (San Diego Res. No. 307244.)  The City Council adopted a resolution authorizing a special election to submit the special tax and bond authorizations to a vote of the qualified electors within the CCFD.  (San Diego Res. No. 307245.)  The election authorization resolution states that the qualified electors would be asked the following question:

> "Shall the San Diego Convention Center Facilities District authorize the San Diego City Council to levy a special tax, and issue not to exceed $575,000,000 in bonds secured thereby and by other revenues, to finance the contiguous expansion, construction, reconstruction, rehabilitation, equipping, replacement and upgrade of the San Diego Convention Center and related expenditures, and establish the appropriations limit for the District . . . ?"  (*Ibid*.)

B.     *The CCFD special tax election*

The City Clerk conducted a mailed-ballot election of the Landowners in the CCFD in March and April 2012.  On April 24, 2012, the City Clerk certified that 19,454,222.42 votes were cast in the election, and that 92.03 percent, or 17,904,588.30 of the total votes cast, were "Yes" votes.  (San Diego Res. No. 307245.)  Based on these results, the City Council declared that the special tax measure had been approved.  (*Ibid*.)

7

C.    *The City directs that the City Clerk record a notice of special tax lien and adopts an ordinance authorizing the levying of the special tax upon a final judicial determination that the special tax is valid*

The City Council directed the City Clerk to record a Notice of Special Tax Lien in connection with the CCFD in May 2012 that states that "no special tax shall be levied until the City has obtained a final validation judgment determining that the special tax was lawfully authorized and is valid." (San Diego Res. No. 307414.)

In October 2012, the City Council took action to delay implementation of the special tax at issue pending a final judgment in this case by adopting an ordinance levying the special tax within the CCFD, conditioned upon, among other events, a final determination by the court "that the special tax is valid." (San Diego Ord. No. 20209.)

D.    *This validation action*

    1.    *The City's complaint and appellants' answers*

In May 2012, the City filed a complaint that contains a single cause of action seeking validation of the CCFD special tax. In its complaint, the City outlined the formation of the CCFD and the election approving the special tax, as described above. (See pt. II.A. and pt. II.B., *ante*.) The City asserted that the "passage of the ballot proposition conferred upon the City Council the authority to levy the special tax to finance the authorized facilities and issue the bonds." The City alleged that "[t]he election was in all respects valid and binding and in accordance with law," and that "[t]he special tax is in all respects legal, valid and binding."

8

Appellants Melvin Shapiro and San Diegans for Open Government (SDOG) each answered the City's complaint.

2.      *The parties' briefing*

The parties filed briefs in the Superior Court pertaining to the validity of the special tax.[3]  In its opening brief, the City contended that the election approving the special tax was valid under the California Constitution.  The City argued in part:

> "Under Article [XIII] A, the imposition of a special tax is subject to voter approval.  Section 53326 of the [Mello-Roos] Act (adopted in 1982 after Proposition 13) establishes who or what is a qualified elector for voting purposes within a community facilities district.  Subdivision (c) authorizes an election by landowners, rather than registered voters, irrespective of the number of registered voters residing with a community facilities district, in cases where the special tax will by its own terms not be apportioned in any tax year on property in residential use.  [(§ 53326, subd. (c).)]  Hotel property, and transitory occupancy of hotel rooms, are not residential properties or residential uses.  [Citation.]
>
> "The Division mandates that special taxes under its provisions may only be levied on hotel properties. . . .  Accordingly, the hotel landowners, as defined under the Division and the [Mello-Roos] Act, are the proper qualified electors for voting purposes within the District.
>
> "To confine the vote on a special tax to the owners of the real property that is going to be subject to the special tax is as old as 'no taxation without representation.'  In fact, it is the opposite side of the same coin—no representation without taxation.  Where a citizen is not going to be asked to pay the special tax, it deprives her of no constitutionally protected interest that she is not permitted to vote on

3      In addition, pursuant to a stipulation among all parties, the City lodged the administrative record as well as a series of other documents related to the expansion of the convention center.  The administrative record and these additional documents have been re-lodged with this court.

it. In fact, giving the decision-making to those directly affected by a tax—those who will pay it—is the policy goal underlying taxpayer protections such as Proposition 13 that are embedded in California law." (Fn. omitted.)

The City further argued that the special tax did not violate article XIII C, section 2, subdivision (d) (adopted by the voters in 1996 through Prop. 218) because "[t]he City sought and received a more than two-thirds affirmative vote from the landowner qualified electors within the CCFD."

Shapiro and SDOG each filed briefs in opposition. Appellants contended that the special tax was invalid under both the California Constitution and the City Charter because the special tax had not been approved by San Diego's "registered, natural-person voters."[4]

With respect to the California Constitution, SDOG argued that, "hoteliers—those who own or lease the land on which the City's hotels are located—are not U.S. Citizens or registered to vote and thus [are] not 'qualified electors.' " SDOG contended that the City's argument that the qualified electors could be comprised only of those individuals and entities that would pay the special tax was incorrect, arguing that there was "[n]othing in the California Constitution or any other controlling legal authority [that] equates 'qualified electors' with 'the persons paying the tax.' " SDOG argued that while

---

4    Shapiro argued, "The Constitution (art. XIII A, § 4) and City Charter (§§ 6, 76.1) make clear that special taxes . . . require approval by two-thirds [of the] general electorate vote." Similarly, SDOG argued, "The special tax was not approved by San Diego's registered, natural-person voters and therefore violates the California Constitution and the San Diego City Charter."

10

weighted landowner voting was permissible under article XIII D, with respect to *assessments*, articles XIII A and XIII C require that the general electorate vote on *taxes*. SDOG noted that the *Neilson* court held that a municipality's registered voters comprised the proper electorate to vote on a special tax imposed under article XIII A, section 4, and specifically rejected the argument that the electorate should be comprised of only the property owners who would actually pay the tax. (Citing *Neilson, supra,* 133 Cal.App.4th at pp. 1312-1313.)[5]

SDOG further argued:

"Also absent from the opening brief . . . is any case law that allows a local government imposing a special tax to make up its own definition of 'qualified electors' for purposes of satisfying the California Constitution. No case stands for that proposition because such a glaring loophole in the constitutional protections for taxpayers would be quickly abused by tax-crazed local governments who would raise taxes by defining 'qualified electors' in a way that ensures victory at the ballot box while circumventing the people. Nothing in the history of Proposition 13, 62, 218, or 26[6] suggests that voters intended such an absurd outcome."

[5]      Appellants raised additional arguments for invalidating the special tax that we need not discuss, in light of our reversal of the judgment on the grounds stated in the text.

[6]      As with Propositions 13 and 218, Propositions 26 and 62 limited the ability of local governments to raise revenue without voter consent. (See, e.g., *Brooktrails Township Community Services Dist. v. Board of Supervisors of Mendocino County* (2013) 218 Cal.App.4th 195, 198 [discussing Prop. 26]; *Borikas v. Alameda Unified School Dist.* (2013) 214 Cal.App.4th 135, 144 [discussing Prop. 62].) We confine our legal analysis to those portions of the California Constitution added by Propositions 13 and 218, because we conclude that they are dispositive of the appellants' claims.

11

With respect to the legality of the special tax election under the City Charter, both Shapiro and SDOG argued that section 76.1 provides that the "the qualified electors of the City" must approve all special taxes authorized under article XIII A, and that section 6 of the City Charter provides that the qualifications of electors for all City elections are the same as those provided under state law for the qualification of electors in general state elections. It is undisputed that state law specifies that persons who are United States citizens and residents of California are qualified electors for purposes of general state elections (Cal. Const., art. II, § 2), and thus may register to vote (Elec. Code, § 2000, subd. (a) [specifying that "[e]very person who qualifies under Section 2 of Article II of the California Constitution and who complies with this code governing the registration of electors may vote"]). According to appellants, the special tax was not validly imposed under the City Charter, because, as SDOG argued, "There can be no dispute that the City's residents who are qualified to vote in California general elections were not given the opportunity to vote on the special tax."

The City filed reply briefs to both appellants' opposing briefs. In its reply to Shapiro's opposition, the City argued that, "In adopting section 53326, subdivision (c), the Legislature determined that, in certain situations, the undefined constitutional term 'qualified electors' means landowners, not registered, natural person voters," and argued that "[t]he Legislature's definition carries great weight." (Citing *San Francisco v. Industrial Acc. Com.* (1920) 183 Cal. 273, 279 ["where a constitutional provision may well have either of two meanings, it is a fundamental rule of constitutional construction

12

that, if the legislature has by statute adopted one, its action in this respect is well nigh, if not completely, controlling"].)  The City further maintained that the City's adaptation of the election procedures specified in the Mello-Roos Act was consistent with the Legislature's desire to "allocate voting power in proportion to the special tax each owner would pay if approved."

The City's summarized its argument by stating:

> "[T]he CCFD voting procedures, the limitation of 'qualified electors' to CCFD 'Landowners,' and the use of a weighted vote allocation did not violate the Constitution.  As discussed above, the [Mello-Roos] Act established the mechanism of weighted, landowner votes to approve special taxes in CFDs [community facilities districts]. [(§ 53326, subd. (c).)]  Under the [Mello-Roos] Act, landowners who will pay the tax levied against their property are the qualified electors; their votes are weighted by the amount of land they own, which reflects a legislative desire to approximate voting power to proposed tax burden.  The CCFD voting methodology and qualified electors are no different constitutionally.  The qualified electors in the CCFD are those Landowners that will be subject to the tax; votes in the CCFD were allocated based on the amount of the special tax each Landowner is expected to pay. . . .  Whether in the CCFD or a CFD formed solely under state law, landowners subject to the special tax make up the qualified electorate."[7]

With respect to the City Charter, the City argued in its reply to Shapiro's opposition that the definition of "qualified elector" in section 6 does not apply to special taxes because the first clause of section 76.1 of the City Charter provides, "Notwithstanding any provision of this Charter to the contrary . . . ."  The City also argued that section 76.1 "explicitly permits limiting the qualified electorate for votes on

_____

[7]     The City presented a similar argument in its reply to SDOG's opposition.

13

special taxes within special districts" in cases in which a special tax will be " 'levied upon less than the entire City,' " and contended that the CCFD special tax would be levied upon less than the entire City because it would be imposed only on the "hotel 'Landowners' identified with the CFFD."[8]

3.    *The trial court's ruling*

After a hearing, the court issued a ruling in favor of the City, validating the special tax.  In its ruling, the trial court first quoted the applicable provisions of the California Constitution and the City Charter, and then stated the following:

> "[Section 53326] of the [Mello-Roos] Act establishes who or what is a qualified elector for voting purposes within a community facilities district ('CFD').  Section 53326[, subdivision (c)] authorizes an election by landowners, rather than registered voters, where the special tax will not be apportioned in any tax year on property in residential use.  Thus, the Legislature established that, in certain situations, qualified electors means landowners.  (See *San Francisco v. Industrial Acc. Com.*[, *supra*, 183 Cal. at p. 279].)  Notably, section 53326[, subdivision (c)] provides, 'the legislative body may provide that the vote shall be by the landowners of the proposed district *whose property would be subject to the tax if it were levied at the time of the election*.'  (Emphasis added.)  Thus, not even all landowners within a CFD must get a vote—only those whose property would be subject to the tax are eligible to vote.  That is how the CCFD was structured.  Hotel property and transitory occupancy of hotel rooms are not residential properties or residential uses.  (See San Diego Mun. Code, §§ 61.2705, 35.0102.)  The [Mello-Roos] Act provides for weighted voting allocation based on the amount of property owned, reflecting a legislative desire to allocate voting power in proportion  to the special tax each owner would pay if approved.  (See *California Bldg. Industry Assn. v. Governing Bd.* (1988) 206 Cal.App.3d 212, 238 [(*California Bldg. Industry Assn.*)].)

---

8    The City incorporated this argument in its reply to SDOG's opposition.

14

"Consistent with the [Mello-Roos] 'Act', the Division defined 'qualified electors' as 'Landowners' within the CCFD, those who own or lease land on which hotels operate. (San Diego Mun. Code, § 61.2710.) The Division mandates that special taxes authorized under its provisions may only be levied on hotel properties. (See San Diego Mun. Code, §§ 61.2706(i), 61.2712), and that qualified electors 'shall in all cases be the Landowners.' (San Diego Mun. Code, § 61.2710(a).)"

The trial court entered a validation judgment in favor of the City that states in relevant part:

"All proceedings encompassed by this validation action by and for the City and the [CCFD] in connection with satisfaction of the voter approval requirement to authorize the [CCFD] special tax, to authorize the issuance of [CCFD] bonds, to levy the special tax, and to establish the appropriations limit for the [CCFD], were and are valid and legally effective and were and are in conformity with the applicable provisions of all laws and enactments at any time in force or controlling upon such proceedings, whether imposed by law, charter, constitution, statute or ordinance, and whether federal, state or municipal."

4.      *The appeals*

Appellants each timely appealed the trial court's judgment. On appeal, appellants contend that the trial court erred in concluding that the manner in which the special tax was enacted does not violate either the California Constitution or the City Charter.[9]

_____

[9]      SDOG also contends that the judgment should be reversed because the City violated the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) by failing to timely prepare an environmental impact report.

Shapiro maintains that the judgment should be reversed because the City's alteration of the Mello-Roos Act's voting procedures exceeded its home rule authority. Shapiro also contends, in the alternative, that the special tax is invalid because it is akin

15

DISCUSSION

A.  *The City's special tax is invalid because it was not approved by a two-thirds vote of either the "qualified electors" or the "electorate" of the City, as is required by the California Constitution*

Appellants claim that the City's special tax is invalid because it was not approved by a two-thirds vote of either the "qualified electors" (art. XIII A, § 4) or the "electorate" (art. XIII C, § 2, subd. (d)) of the City, as required by the California Constitution. Appellants maintain that the City's *registered voters* are the "qualified electors" (art. XIII A, § 4) of the City and are the City's "electorate" (art. XIII C, § 2, subd. (d)).  In contrast, the City contends that "the qualified electors [under article XIII A, section 4] may be comprised of different constituents depending on the nature of the district and the special tax to be imposed."  The City further contends that Proposition 218 (which adopted art. XIII C, § 2, subd. (d)) "does not apply to landowner qualified electors in community facilities district elections."  Resolution of these issues requires that we interpret the California Constitution.

1.  *Applicable principles of interpretation and standard of review*

As our Supreme Court emphasized in *Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431 (*Silicon Valley*), in a

---

to either an assessment or a hotel occupancy tax, and the City did not comply with the legal requirements to impose either an assessment or a hotel occupancy tax.
     We need not consider these additional arguments in light of our reversal of the judgment on the grounds stated in the text.

case that challenged the legality of local government's actions under Proposition 218, "We ' " 'must enforce the provisions of our Constitution and "may not lightly disregard or blink at . . . a clear constitutional mandate." ' " ' [Citation.] In so doing, we are obligated to construe constitutional amendments in a manner that effectuates the voters' purpose in adopting the law." (*Silicon Valley, supra*, at p. 448.)

The *Silicon Valley* court outlined the principles that govern our interpretation of those provisions of the California Constitution that were adopted by the voters:

> "[W]e apply the familiar principles of constitutional interpretation, the aim of which is to 'determine and effectuate the intent of those who enacted the constitutional provision at issue.' [Citation.] 'The principles of constitutional interpretation are similar to those governing statutory construction.' [Citation.] If the language is clear and unambiguous, the plain meaning governs. [Citation.] But if the language is ambiguous, we consider extrinsic evidence in determining voter intent, including the Legislative Analyst's analysis and ballot arguments for and against the initiative. [Citations.]" (*Silicon Valley, supra*, 44 Cal.4th at pp. 444-445.)

Moreover, " '[r]udimentary principles of construction dictate that when constitutional provisions can reasonably be construed so as to avoid conflict, such a construction should be adopted.' [Citation.]" (*Greene, supra*, 49 Cal.4th at p. 290.)

"Because interpretation of a constitutional provision . . . is a question of law, we perform that interpretation de novo, or independently, and are not bound by the trial court's analysis or conclusion." (*Taxpayers for Accountable School Bond Spending v. San Diego Unified School Dist.* (2013) 215 Cal.App.4th 1013, 1026.)

17

2.    *The relevant constitutional provisions*

Article XIII A, section 4 (added by Prop. 13, § 4) provides:

> "Cities, Counties and special districts, by a two-thirds vote of the
> qualified electors of such district, may impose special taxes on such
> district, except ad valorem taxes on real property or a transaction tax
> or sales tax on the sale of real property within such City, County or
> special district."

Article XIII C, section 2, subdivision (d) (added by Prop. 218, § 3) provides in

relevant part:

> "No local government may impose, extend, or increase any special
> tax unless and until that tax is submitted to the electorate and
> approved by a two-thirds vote."

3.    *The City's "qualified electors" for purposes of article XIII A, section 4, and*
       *the City's "electorate" for purposes of article XIII C, section 2, subdivision*
       *(d) are the registered voters of the City*

The text, constitutional history, and purpose of both article XIII A, section 4, and

article XIII C, section 2, subdivision (d) support the conclusion that the City's special tax

election was invalid under the state Constitution.  Neither public policy considerations

nor section 53326, subdivision (c) of the Mello-Roos Act warrants a contrary conclusion.

a.    *The text of article XIII A, section 4 makes clear that the City's*
       *"qualified electors" are the City's registered voters*

The text of article XIII A, section 4 states that a city may impose a special tax if it

receives a "two-thirds vote of the qualified electors" of the city.[10]  The *Neilson* court

_____

[10]    The City does not dispute that it is the *City*, rather than the *CCFD*, that seeks to
impose the tax in this case.  Indeed, the City alleged in its validation complaint that the

18

concluded that the "the term 'qualified electors' means registered voters." (*Neilson, supra*, 133 Cal.App.4th at p. 1313, quoting art. XIII A, § 4.)

In *Neilson*, a "nonresident landowner challenged a flat-rate parcel tax imposed by a city after the city's registered voters approved the tax by a two-thirds majority." (*Neilson, supra*, 133 Cal.App.4th at p. 1301.) The nonresident landowner contended that "the affected property owners, not the registered voters of [City of California City], were the 'qualified electors' for purposes of section 4 of article XIII A." (*Id.* at p. 1312.) The City of California City argued in response that "section 4 of article XIII A should be harmonized with section 2 of article XIII C [added by Proposition 218], and that various definitions [that were] in place at the time Proposition 218 was adopted lead to the conclusion that City's resident voters are the relevant electorate." (*Id.* at pp. 1312-1313.) The *Neilson* court outlined those definitions as follows:

> "The Elections Code defines 'elector' to mean 'any person who is a United States citizen 18 years of age or older and a resident of an election precinct at least 15 days prior to an election.' (Elec. Code, § 321.) The Elections Code does not contain a formal definition of the word 'qualified,' but it does contain variations of that word that are useful in determining its meaning. For example, division 2 of the Elections Code is titled 'Voters' and it contains chapters titled 'Voter Qualifications' (ch. 1, beginning with § 2000) and 'Registration' (ch. 2, beginning with § 2100). Pursuant to section 2000 of the Elections Code, '[e]very person who *qualifies* under Section 2 of Article II of the California Constitution and who complies with this code governing the registration of electors may vote at any election held within the territory within which he or she resides and the election is held.' (Italics added.) Article II, section 2

---

special tax election gave "the *City Council* authority to levy the special tax to finance the authorized facilities and issue the bonds." (Italics added.)

19

provides that a 'United States citizen 18 years of age and resident in this state may vote.' Also, Elections Code section 359 provides that 'voter' means 'any elector who is registered under this code.' " (*Id.* at p. 1313.)[11]

In light of these provisions, the *Neilson* court concluded that "section 4 of article XIII A required the special tax to be approved by two-thirds of [City of California City's] *registered voters* who voted in the election concerning [the special tax]." (*Neilson, supra*, 133 Cal.App.4th at p. 1313, italics added; see also *Foothill-De Anza Community College Dist. v. Emerich* (2007) 158 Cal.App.4th 11, 26 [agreeing with *Neilson* and stating nonresident property owner was not qualified to vote on school bond measure, and rejecting nonresident property owner's argument that "qualified electors are the persons who, like him, are going to actually pay the tax"].) The *Neilson* court also rejected the nonresident landowner's contention that only property owners should be permitted to vote on the tax because "the voting eligibility requirements that [the nonresident landowner] proposes are set forth in article XIII D [adopted as part of Proposition 218] in regards to special *assessments*," not *taxes*.[12] (*Neilson, supra*, at p. 1313, italics added.)

---

11    The *Neilson* court observed in a footnote that the Public Utilities Code defines "qualified elector" in relevant part as "a voter whose name appears on the great register of the county in which the district is located . . . ." (*Neilson, supra*, 133 Cal.App.4th at p. 1313, fn. 6, quoting Pub. Util. Code, § 15505.)

12    (See pt. III.A.3.d., *post* for a discussion of the distinct voting requirements established by Proposition 218 with respect to *taxes* (art. XIII C) and *assessments* (art. XIII D).)

The California Attorney General has reached the same conclusion as did the *Neilson* court. (See 66 Ops.Cal.Atty.Gen. 321 (1983) [interpreting the "the two-thirds majority vote provision[] of . . . article XIII A, section 4," and stating, "the requisite two-thirds majority is to be based upon . . . those *registered voters* who actually voted," italics added].) We accord the opinion of the Attorney General "great weight," while recognizing that the opinion is not "controlling as to the meaning of a constitutional provision or statute." (*County of Fresno v. Clovis Unified School Dist.* (1988) 204 Cal.App.3d 417, 427 (*County of Fresno*).)

As both *Neilson* and the Attorney General's opinion suggest, interpreting the phrase "vote of the *qualified electors*" in article XIII A, section 4 (italics added), to refer to a vote of *registered voters* is fully consistent with the text of the provision. The term "qualified elector" is a term that has long been used in California law to refer to registered voters, without further qualification.[13] (See, e.g., *Allyn v. Allison* (1973) 34

_____

[13] A textual argument can be made that the City's special tax is invalid because, by referring to "qualified electors," the voters who adopted Proposition 13, section 4 intended to require the assent of two-thirds of those possessing the *qualifications* to vote under the state Constitution, whether or not they were *registered* to do so. (See 66 Ops.Cal.Atty.Gen. 321, *supra* [considering, but rejecting this interpretation of art. XIII A, § 4]; cf. *Ni v. Slocum* (2011) 196 Cal.App.4th 1636, 1654 [noting the distinction in former Political Code section 1083a between "qualified electors" and "registered qualified elector[s]"]; *Shamsian v. Department of Conservation* (2006) 136 Cal.App.4th 621, 634, fn. 3 [quoting former Elec. Code, § 304 as providing, "The Secretary of State shall adopt regulations requiring each county to design and implement programs intended to identify *qualified electors* who are not *registered voters*, and to register such persons to vote"].) However, such an interpretation would be impracticable, since the ordinary manner of determining those who are *qualified* to vote is through voter registration. (See *Collier v. Menzel* (1985) 176 Cal.App.3d 24, 33 [" '[Registration] . . . is to be regarded as a

Cal.App.3d 448, 451, citing *Bergevin v. Curtz* (1889) 127 Cal. 86, 88 (*Bergevin*)

[discussed below]; *McMillan v. Siemon* (1940) 36 Cal.App.2d 721, 726 (*McMillan*) ["The

term '*qualified elector*,' as used in [former] article II, section 1,[14] of the Constitution,

we think . . . means an elector who is entitled to vote," italics added]; *Welch v. Williams*

(1892) 96 Cal. 365, 367 ["The object of the registration law is to prevent illegal voting by

providing, in advance of election, an authentic list of the *qualified electors,*" italics

added]; see also 44 Ops.Cal.Atty.Gen. 159 (1964) ["The term '*qualified elector*' in this

state has a precise meaning.  It connotes a status and not a term of residency.  '*Qualified*

*elector*' means an elector *who is entitled to vote*.  In short, it is synonymous with the

terms 'voter' or 'registered voter,' " first two italics added]; accord City Charter, § 6

[entitled "*Qualified Electors*," and stating, "The qualifications of an elector at any

election held in the City under the provisions of this Charter shall be the same as those

---

reasonable regulation by the legislature for the purpose of ascertaining who are qualified
electors in order to prevent illegal voting' "].)  In addition, we agree with the *Neilson*
court that by referring to a "*vote* of the qualified electors" (art. XIII A, § 4, italics added),
article XIII A requires an affirmative vote of two-thirds of registered voters who vote in
an election on the imposition of a special tax. (*Neilson, supra*, 133 Cal.App.4th at p.
1313.)

14     The *McMillan* court noted that a former provision of the California Constitution
expressly used the term "qualified elector" in the same provision that defined the
qualifications of an elector: "[Former] Article II, section 1, of the Constitution, after
specifying the qualifications of an elector, contains the following proviso: 'Provided, any
person duly registered as an elector in one precinct and removing therefrom to another
precinct in the same county within forty days prior to an election, shall for the purpose of
such election be deemed to be a resident and *qualified elector* of the precinct from which
he so removed until after such election.' " (*McMillan, supra*, 36 Cal.App.2d at p. 724,
italics added.)

22

prescribed by the general law of the State for the qualification of electors at General State Elections," italics added].)

In *Bergevin*, after noting that the state Constitution prescribes the "qualifications of an elector" (*Bergevin, supra*, 127 Cal. at p. 88), the Supreme Court explained that voting registration requirements are a method of determining which individuals are "*qualified electors*." (*Ibid*., italics added; see also *Minges v. Board of Trustees* (1915) 27 Cal.App. 15, 18 [citing *Bergevin* and stating, "A qualified elector, then, is a person whose qualifications measure up to the constitutional standard"].) Thus, in requiring a "vote of the qualified electors," the text of article XIII A, section 4 supports the conclusion that the provision requires a vote of those who reside in the relevant district and possess the qualifications to vote under our state Constitution and who have registered to vote.

Further, we are aware of no authority, and the City has cited none, that suggests that the phrase "qualified electors" has ever been used generically to describe a group of persons entitled to vote based on qualifications *other than* those specified by our state Constitution. (See Cal. Const., art. II, § 2 ["A United States citizen 18 years of age and resident in this State may vote"; Elec. Code, § 2000 [stating that every person who "qualifies" under article II, section 2 of the California Constitution and who has registered may vote].)[15] Thus, the text of article XIII A, section 4 indicates that an

---

[15] Several other provisions of the California Constitution refer to "qualified electors." (See, e.g., Cal. Const., art. IX, § 2 ["A Superintendent of Public Instruction shall be elected by the *qualified electors* of the State at each gubernatorial election," italics added]; Cal. Const., art. XI, § 1, subd. (a) ["No county seat shall be removed unless two-

23

election in which only a small subset of landowners and leaseholders are permitted to vote is not an election of the City's "qualified electors."

The City offers no textual argument to counter the *Neilson* court's conclusion that the phrase "qualified electors" in article XIII A, section 4 refers to the registered voters of the entity (e.g., city, county, or special district) imposing a special tax. However, the City notes that the *Neilson* court stated, "[T]he prepositional phrase 'of such district' [in article XIII A, section 4] means [City of California City] because the tax is imposed by [City of California City] on all parcels within its geographical limits." (*Neilson, supra*, 133 Cal.App.4th at p. 1313.) The City contends that *Neilson*'s "holding does not apply," because, according to the City, "the CCFD special tax will not be imposed on all City parcels, but only on parcels on which hotels operate." We do not read the *Neilson* court's statement as interpreting article XIII A, section 4 to mandate an election of all of a city's registered voters *only* where the special tax will be imposed on *all* parcels in a

_____

thirds of the *qualified electors* of the county, voting on the proposition at a general election, shall vote in favor of such removal," italics added]; Cal. Const., art. XXXIV, § 1 ["No low rent housing project shall hereafter be developed, constructed, or acquired in any manner by any state public body until, a majority of the *qualified electors* of the city, town or county, as the case may be, in which it is proposed to develop, construct, or acquire the same, voting upon such issue, approve such project by voting in favor thereof at an election to be held for that purpose, or at any general or special election," italics added].) We are aware of no authority that suggests that the term "qualified electors" in these provisions has been interpreted to refer to anything other than registered voters.

municipality.[16]  Rather, we read this portion of *Neilson* as simply meaning that the registered voters of the City of California City were the proper voters to vote on the parcel tax at issue in that case, since the tax would be imposed within the City of California City.  As so interpreted, we fully agree with this aspect of *Neilson*.

    b.    *The constitutional history of article XIII A, section 4 is consistent with the conclusion that the City's "qualified electors" are its registered voters*

Interpreting the term "qualified electors" as synonymous with registered voters is consistent with the materials that were presented to the voters in connection with the approval of Proposition 13.  The Legislative Analyst's description of Proposition 13 stated in relevant part, "This initiative would: . . . . authorize local governments to impose certain nonproperty taxes if two-thirds of the *voters* give their approval in a local election."  (Ballot Pamp., Primary Elec. (June 6, 1978), analysis of Prop. 13 by Legis. Analyst, p. 56, italics added; see also *California Bldg. Industry Assn., supra,* 206 Cal.App.3d at p. 230 ["In reviewing the relevant 1978 voter pamphlet, it can easily be inferred from the information given there [citation] that voters believed they were authorizing special taxes which . . . [required] approval by two-thirds of the *voters* in the

---

16    Interpreting article XIII A as requiring an election of a district's registered voters *only* where the special tax will be imposed on *all o*f the parcels in a district has no basis in the text of the provision.

25

city, county or special district," italics added].)[17]  In short, the voters who voted on Proposition 13 were expressly informed at the time they approved the proposition, in the materials accompanying the ballot measure, that future local government special tax increases would require the assent of the *voters*.  There is *nothing* in either the text or the constitutional history of Proposition 13 that suggests that voters intended for *local governments* to be able to exclude large numbers of registered voters from voting in a special tax election by limiting who would be deemed "qualified electors" for purposes of the election.

c.      *The  intent of the voters in enacting article XIII A, section 4 to restrict the taxing authority of local governments supports the conclusion that the City's special tax election violated the state Constitution*

Interpreting "qualified electors" as describing a single, defined set of persons, i.e. registered voters, is consistent with California voters' intent in enacting article XIII A, section 4.  In *Rider v. County of San Diego* (1991) 1 Cal.4th 1 (*Rider*), the Supreme Court explained that the voters adopted section 4 of Proposition 13 in order "to restrict the ability of local governments to impose new taxes to replace property tax revenues lost under the other provisions of [Proposition 13]."  (*Rider, supra,* at p. 11; see also *Howard Jarvis Taxpayers Assn. v. County of Orange* (2003) 110 Cal.App.4th 1375, 1384 [the

_____

17      On our own motion, we take judicial notice of the 1978 ballot pamphlet materials associated with Proposition 13, including the summary prepared by the Attorney General, the Legislative Analyst's analysis, and the ballot arguments for and against the initiative. (See *PG&E Corp. v. Public Utilities Com.* (2004) 118 Cal.App.4th 1174, 1204, fn. 25 [appellate court may take judicial notice of legislative history materials on its own motion].)

26

"*raison d'être* [of Proposition 13] was to limit municipalities' taxing power"].)  The *Rider* court considered this intent in determining whether an agency that adopted an ordinance to impose a "supplemental sales tax . . . throughout the [County of San Diego] for the purpose of financing the construction of justice facilities" (*Rider, supra*, at p. 5) constituted a "special district" under article XIII A, section 4 subject to the two-thirds super-majority requirement, despite the agency's "lack of power to levy a tax on real property."  (*Rider, supra,* at p. 10.)  Notwithstanding the textual ambiguity of the meaning of the term "special district" (art. XIII A, § 4) and prior case law that suggested that the agency was not a special district because it lacked the power to levy a tax on real property,[18] the *Rider* court held "that 'special district' . . . include[s] any local taxing agency created to raise funds for city or county purposes to replace revenues lost by reason of the restrictions of Proposition 13." (*Rider, supra*, at p. 11.)  The *Rider* court concluded that the tax was invalid because it had been approved by a simple majority vote, rather than by a two-thirds vote, as required by article XIII A, section 4.  (*Rider, supra*, at pp. 5-6.)

In reaching this holding, the *Rider* court explained, "We must attempt to determine whether the framers, in using the term 'special district,' intended to adopt a definition that

18    The *Rider* court acknowledged that it had previously concluded in *Los Angeles County Transportation Com. v. Richmond* (1982) 31 Cal.3d 197, 208 (*Richmond*), that the term "special district" was ambiguous, "having been given varying interpretations in prior cases and statutes" (*Rider, supra*, 1 Cal.4th at p. 7), and that a transit commission created prior to the passage of Proposition 13 that lacked the power to levy a tax on real property was not a special district subject to article XIII A, section 4.  (*Rider*, *supra*, at pp. 7-8 [describing holding in *Richmond*].)

27

could so readily permit circumvention of section 4." (*Rider, supra*, 1 Cal.4th at p. 11.)  In concluding that the justice facilities financing agency was a special district subject to Proposition 13's limitations on special taxation, the *Rider* court stated that the intent of the voters in enacting article XIII A, section 4 "would be frustrated if cities and counties were . . . permitted to arrange for the formation of local taxing districts to finance municipal functions without securing the requisite two-thirds voter approval."  (*Rider, supra*, at p. 11.)

Similarly, in this case, we must determine whether the same voters who enacted Proposition 13 in order to "circumscribe the taxing power of local government" (*Rider, supra*, 1 Cal.4th at p. 6) nevertheless intended for *local governments* to be able to define the class of electors who would be eligible to vote on a special tax, depending on, as the City argues, the "nature of the district and the special tax to be imposed."  We think it is clear that the voters who enacted Proposition 13 did not so intend.  In our view, the City's interpretation of article XIII A, section 4 would allow the City to:

> "readily circumvent the super-majority vote requirement of section 4 'by the simple creation of a district which is geographically precisely coterminous with [the City], but which [has different 'qualified electors'] . . . [and thereby] cut a hole in the financial fence which the people in their Constitution have erected around their government.  Governmental entities may be expected, instinctively, to pour through the opening seeking the creation of similar revenue-generating [mechanisms] in myriad forms which will be limited only by their ingenuity.' "  (*Rider, supra*, 1 Cal.4th at p. 8, quoting *Richmond, supra*, 31 Cal.3d at p. 213 [dis. opn. by Richardson, J.].)

28

Interpreting the term "qualified electors" (art. XIII A, § 4) to refer to registered voters is consistent with the voters' intent to limit the taxing power of local governments. Indeed, the intent of the voters at issue in this case is far more evident than was that intent in *Rider*, since unlike the "ambiguous" (*Rider, supra*, 1 Cal.4th at p. 7) term "special district" (art. XIII A, § 4) that was at issue in *Rider*, the voters used the well-defined term "qualified electors" (art. XIII A, § 4) to prescribe the body of persons whose assent would be required prior to a local government's imposition of a special tax. (See pt. III.A.3.a., *ante*.) Since " 'the intent of the voters is the paramount consideration' " in our interpretation of article XIII A, section 4, this analysis strongly supports the conclusion that the election approving the special tax was invalid. (*Silicon Valley Taxpayers' Assn. v. Garner* (2013) 216 Cal.App.4th 402, 407.)

      d.     *The text, history, and purpose of Proposition 218 support the conclusion that registered voters also comprise the "electorate" in article XIII C, section 2, subdivision (d)*

The City does not dispute that that the terms "qualified electors" in article XIII A, section 4 (added by Prop. 13) and "electorate" in article XIII C, section 2, subdivision (d) (added by Prop. 218) should be given the same meaning.[19] We agree. Although worded slightly differently, the text of the two provisions is similar, requiring that before the City may impose a special tax it must gain the approval of "a two-thirds vote of the *qualified*

___

[19]     The City's position is that Landowners are "qualified electors" under article XIII A, section 4, that Proposition 218 did not alter the constitutional requirements governing the imposition of special taxes, and that, therefore, Landowners are also a proper "electorate" under article XIII C, section 2, subdivision (d).

*electors*" (art. XIII A, § 4, italics added) and "a two-thirds vote" of the "*electorate*" (art. XIII C, § 2, subd. (d), italics added).  The Supreme Court has used the terms interchangeably—repeatedly using the term 'electorate' when describing the "qualified electors" voter approval requirement contained in article XIII A, section 4 (added by Prop. 13), thus providing support for the conclusion that the two terms should be interpreted to mean the same thing.  (See, e.g., *Silicon Valley*, *supra*, 44 Cal.4th at p. 442 [" ' "To prevent local governments from subverting its limitations, Proposition 13 also prohibited counties, cities, and special districts from enacting any special tax without a two-thirds vote of the electorate . . . " ' " quoting *Apartment Assn. of Los Angeles County, Inc., supra,* 24 Cal.4th at p. 836].)

In addition, "because Proposition 218 was designed to close government-devised loopholes in Proposition 13, the intent and purpose of the latter informs our interpretation of the former."  (*Apartment Assn. of Los Angeles County, Inc., supra*, 24 Cal.4th at p. 839; and see *id*. at p. 837 [describing history of the enactment of Prop. 218 as " 'buttress[ing] Proposition 13's limitations on ad valorem property taxes and special taxes by placing analogous restrictions on assessments, fees, and charges' "].)  While the primary purpose of Proposition 218 was to reform the law governing local government's imposition of revenue generating devices *other* than special taxes (such as general taxes, assessments, and fees), it is clear from the text of article XIII C, section 2, subdivision (d) that the voters who enacted Proposition 218 intended to reaffirm the super-majority limitation initially imposed by Proposition 13 on the ability of local governments to

30

impose special taxes. (See Ballot Pamp., Gen. Elec. (Nov. 5, 1996) official title and summary prepared by the Attorney General, p. 72 [stating that Prop. 218 "[r]equires [that] majority of voters approve increases in general taxes and *reiterates that two-thirds must approve special tax,*" italics added].)[20]

In light of the similarity of the relevant text of article XIII A, section 4 and that of article XIII C, section 2, subdivision (d), the constitutional history of the two provisions, and "our duty to harmonize constitutional provisions where possible" (*McWilliams v. City of Long Beach* (2013) 56 Cal.4th 613, 627), we conclude that both provisions refer to the same group of persons whose approval is required before the City may impose a special tax.

The fact that Proposition 218 *did* expressly permit property owners to vote on certain *assessments* (art. XIII D) provides strong support for the conclusion that the voters who enacted Proposition 218 did *not* intend to permit local governmental entities to impose property qualifications for electors in elections involving *taxes* (art. XIII C).[21]

---

[20] On our own motion, we take judicial notice of the entirety of the 1996 ballot pamphlet materials associated with Proposition 218 (Ballot Pamphlet on Prop. 218), including the summary prepared by the Attorney General, the Legislative Analyst's analysis, and the ballot arguments for and against the initiative. (See *PG&E Corp. v. Public Utilities Com.*, *supra*, 118 Cal.App.4th at p. 1204, fn. 25.) Our ruling moots SDOG's request that we take judicial notice of the "Rebuttal Argument Against Proposition 218" from the Ballot Pamphlet on Proposition 218, quoted in the text below.

[21] The City does not contend that the election at issue in this case was a valid " 'assessment ballot proceeding' " (Elec. Code, § 4000, subd. (c)(8)(A)) as provided for in article XIII D. (See Elec. Code, § 4000, subd. (c)(8)(A) [specifying that the voting

31

(See, e.g, *Golden Hill Neighborhood Assn, Inc. v. City of San Diego* (2011) 199 Cal.App.4th 416, 430 ["Proposition 218's weighted voting requirement, set forth in article XIII D, section 4, subdivision (e),[22] enhances taxpayer consent by giving property owners whose properties are proposed to be assessed in amounts greater than other owners' properties a proportionately greater say as to whether the proposed assessment will be instituted"].)

The lack of any provision comparable to the weighted property owner voting provisions mandated for *assessments* in article XIII D that would permit only property owners to vote on *taxes* supports the conclusion that article XIII C, section 2, subdivision (d) requires the approval of two-thirds of the *registered voters* when a local government seeks to impose special *taxes*. (See *Neilson, supra*, 133 Cal.App.4th at p. 1313 [noting that voting limited to property owners is permitted with respect to *assessments* but not with respect to special *taxes*].)

---

procedure authorized by art. XIII D shall be "denominated an 'assessment ballot proceeding' "].)

22     Article XIII D, section 4, subdivision (e) provides:
> "The agency shall conduct a public hearing upon the proposed assessment not less than 45 days after mailing the notice of the proposed assessment to *record owners of each identified parcel*. At the public hearing, the agency shall consider all protests against the proposed assessment and tabulate the ballots. The agency shall not impose an assessment if there is a majority protest. A majority protest exists if, upon the conclusion of the hearing, ballots submitted in opposition to the assessment exceed the ballots submitted in favor of the assessment. In tabulating the ballots, the ballots shall be weighted according to the proportional financial obligation of the affected property." (Italics added.)

32

Article XIII D, section 4, subdivision (g) expressly contrasts "electors" and the "electorate" with "property owners":

> "Because only special benefits are assessable, *electors* residing within the district who do not own property within the district shall not be deemed under this Constitution to have been deprived of the right to vote for any assessment.[23]  If a court determines that the Constitution of the United States or other federal law requires otherwise, the assessment shall not be imposed unless approved by a two-thirds vote of the *electorate* in the district in addition to being approved by the *property owners* as required by subdivision (e)." (Italics added.)

Article XIII D, section 4, subdivision (g) makes it clear that the voters who enacted Proposition 218 did not intend for the "electorate" (art. XIII C, § 2, subd. (d); art.

---

23    The California Constitution expressly forbids conditioning the right to vote on the ownership of property.  (Cal. Const., art. I, § 22 ["The right to vote or hold office may not be conditioned by a property qualification"].)  Similarly, the equal protection clause of the 14th Amendment to the federal Constitution has been interpreted to preclude franchise restrictions based on property ownership in certain elections.  (*Southern Cal. Rapid Transit Dist. v. Bolen* (1992) 1 Cal.4th 654, 664-673 [reviewing case law].)

While this "state constitutional provision prohibiting property qualification for electors and the one-person, one-vote requirement rooted in the state and federal equal protection provisions do not apply to *fee* and *assessment* elections conducted by limited purpose government agencies that disproportionately affect certain property owners" (*Greene, supra*, 49 Cal.4th at p. 297, fn. 8, italics added), we are aware of no authority holding that this provision does not apply to *tax* elections.  Our conclusion that the special tax election was invalid for the reasons stated in the text obviates the need to determine the substantial constitutional question of whether the special tax election in this case also violated the state Constitution prohibition concerning property qualifications in elections or the one person one vote guarantee of the equal protection clause of the 14th Amendment to the federal Constitution.  (Cf. *Southern Cal. Rapid Transit Dist. v. Bolen, supra,* 1 Cal.4th at p. 659 [holding that "under the narrow circumstances presented" a statute prescribing a "voting scheme" concerning the establishment of "*assessment* districts" that "condition[ed] the right to vote on the ownership of real property and alloting votes on the basis of its assessed value" "survive[d] constitutional scrutiny," italics added].)

33

XIII D, § 4, subd. (g)) to be subject to property qualifications, as was the case for the electorate who voted on the special tax at issue in this case. (See *Legal Services for Prisoners with Children v. Bowen* (2009) 170 Cal.App.4th 447, 459 ["when a word is used repeatedly in the Constitution, it is given the same meaning throughout unless the context clearly requires otherwise"].) Indeed, our Supreme Court has directly stated, albeit in dicta,[24] that special tax elections *may not* contain property qualifications for electors. (See *Greene, supra*, 49 Cal.4th at p. 297 ["fee elections in article XIII D, section 6, subdivision (c) authorize limiting the election to only property owners, while most other elections, including elections pertaining to *special* and general *taxes in article XIII C, section 2, do not permit property qualifications*," italics added].) Validation of the special tax election in this case would be directly contrary to the voters' use of the term "electorate" in article XIII C, section 2, subdivision (d), and to our Supreme Court's statement in *Greene* that elections pertaining to special taxes do not permit property qualifications.

The ballot pamphlet materials that were presented to the electorate that voted on Proposition 218 further support the conclusion that the election on the special tax in this case was invalid. Those opposed to Proposition 218 referred to the voting format specified in the proposition related to *assessments* and argued, "YOU LOSE RIGHTS;

---

[24]  Notwithstanding that the *Greene* court's statement was dicta, "[D]icta from the California Supreme Court is highly persuasive and should generally be followed." (*Wechsler v. Superior Court* (2014) 224 Cal.App.4th 384, 393, fn. 2.)

34

CORPORATIONS, DEVELOPERS, NON-CITIZENS GAIN VOTING POWER."[25] (Ballot Pamp. on Prop. 218, *supra*, argument against Prop. 218, p. 77.)  In rebuttal to the argument against Proposition 218, those supporting Proposition 218 stated, "Under Proposition 218, *only California registered voters, including renters, can vote in tax elections*.  Corporations and foreigners get no new rights."  (Ballot Pamp. on Prop. 218, *supra*, rebuttal to argument against Prop. 218, p. 77.)  In the special tax election in this case, the City's registered voters were *not* permitted to vote—unless they happened to be Landowners, and to the extent Landowners were a corporation or a foreigner, they *were* permitted to vote.

e.      *The City's policy argument is unpersuasive*

In its brief on appeal, the City alludes to an argument, more fully developed in its trial brief, that "the appropriate qualified electors to approve or reject the CCFD special tax were those 'landowners' that will have to pay it."  There are several problems with this contention.  To begin with, regardless of any policy merits of having only Landowners vote on the special tax, our state Constitution mandates that qualified *electors* and the *electorate* approve the imposition of special taxes.[26]  If the voters who adopted

---

[25]      Specifically, the argument against Proposition 218 referred to sections (4)(e) and 4(g) of Proposition 218 (art. XIII D, § 4, subds. (e) & (g)).  (Ballot Pamp. on Prop. 218, *supra*, argument against Prop. 218, p. 77.)

[26]      In addition, the City's defining "qualified electors" as Landowners (San Diego Mun. Code, § 61.2710) is, at a minimum, in tension with the state and federal constitutional tradition prohibiting property qualification in municipal elections.  (See fn.

35

Propositions 13 and 218 had desired that only qualified *property owners* be permitted to vote on the imposition of special taxes, they were clearly aware of the text to use to evince such intent.  (See, e.g., art. XIII D, § 4, subd. (g) [referring to assessment ballot proceeding among "*property owners*," italics added]; accord *Southern Cal. Rapid Transit Dist. v. Bolen*, *supra*, 1 Cal.4th at p. 660 [under *assessment* voting scheme "qualified *owners* are allotted one vote for each $1,000 of assessed value of their real property," italics added].)

Second, the specification of a voting scheme for the imposition of *taxes* in article XIII C that is distinct from the voting scheme specified for the imposition of *assessments* in article XIII D is explained by the "very different" natures of taxes and assessments. (*Silicon Valley, supra,* 44 Cal.4th at p. 442 [describing the distinctions between special taxes and special assessments], citing *Knox v. City of Orland* (1992) 4 Cal.4th 132 (*Knox*).)  "[A] special assessment is a charge levied against real property within a particular district for the purpose of conferring a special benefit on the assessed properties beyond any benefit received by the general public." (*Schmeer v. County of Los Angeles* (2013) 213 Cal.App.4th 1310, 1319, citing *Knox, supra,* at pp. 141-142.)  In contrast, "[a] 'special tax' . . . is imposed to provide benefits to the general public" (*ibid.*), and it is possible that those who are burdened by the tax may enjoy no benefit from its

23, *ante*; *Curtis v. Board of Supervisors* (1972) 7 Cal.3d 942, 962-963 [stating that "residents have a constitutional right to vote in municipal elections [citation]; . . . nonresident landowners have no such right," and that "we entertain no doubt that the state cannot enact a provision which gives absentee and corporate landowners the power to *override* the needs and interests of the residents" (*id*. at p. 963)].)

expenditure. (*Silicon Valley*, *supra*, 44 Cal.4th at p. 442, citing *Knox, supra,* at pp. 141-142.)

The voters who enacted Proposition 218 reasonably believed that the general electorate should be the body to decide how to apportion the benefits and burdens of *taxes*, both general and special (art. XIII C),[27] since the benefits of such taxation would accrue to the general public and the burdens could fall, at least in part, upon those who would not benefit. In contrast, these same voters reasonably gave affected property owners the right to vote on certain special *assessments* (art. XIII D), given that " 'a special assessment . . . in reality . . . is a compulsory charge to recoup the cost of a public improvement made for the special benefit of particular property.' [Citation.]" (*Knox, supra*, 4 Cal.4th at p. 142.)

Finally, despite the superficial normative appeal of allowing those who "pay" for a tax to approve its imposition, it is often difficult to calculate the true economic incidence of any given tax. (See *Fulton Corp. v. Faulkner* (1996) 516 U.S. 325, 340-341 [noting the "extreme complexity of economic incidence analysis"].)[28] While the City argues that

---

[27] In addition to mandating that two-thirds of the "electorate" approve the imposition of *special* taxes (art. XIII C, § 2, subd. (d)), article XIII C, section 2 also mandates that a majority of the "electorate" approve the imposition of *general* taxes. (Art. XIII C, § 2, subd. (b) ["No local government may impose, extend, or increase any general tax unless and until that tax is submitted to the electorate and approved by a majority vote"].)

[28] The economic incidence of a tax refers to the party or parties who will ultimately bear the economic burden of the tax. The economic incidence of a tax may differ from the legal incidence of the tax, which refers to the party or parties who are responsible for

37

only Landowners should vote on the special tax since they are the taxpayers who will pay the tax, it is far from clear that the incidence of the special tax will actually fall only on Landowners and not on those individuals who pay for hotel rooms and generate the room revenue on which the tax is based.[29]  Further, even assuming that the incidence of the tax *would* fall solely on Landowners, this would not support the conclusion that Landowners are the proper class of persons to vote on the tax.  That is because " ' "[n]othing is more familiar in taxation than the imposition of a tax upon a class or upon individuals who enjoy no direct benefit from its expenditure, and who are not responsible for the condition to be remedied." ' "  (*Silicon Valley, supra*, 44 Cal.4th at p. 442, quoting *Knox, supra*, 4 Cal.4th at p. 142.)  Giving Landowners the unilateral right to determine how to apportion the benefits that would flow from a tax whose burdens may well fall on others would be contrary to both the Constitution and ordinary principles of taxation.

In short, the City's policy argument is unpersuasive, and does not provide support for the conclusion that the special tax election at issue in this case was valid.

---

remitting a particular tax to the government.  The *Fulton Corp.* court explained this distinction by stating, "It is well established that 'the ultimate distribution of the burden of taxes [may] be quite different from the distribution of statutory liability' [citation], with such divergence occurring when the nominal taxpayer can pass it through to other parties . . . ."  (*Fulton Corp. v. Faulkner, supra*, 516 U.S. at p. 341.)

[29]    As SDOG argues, it is also clear that Landowners would not be the only persons or entities potentially affected by the economic effects of an increase in a tax that could lead to a decrease in the numbers of persons staying in hotel rooms in San Diego.  In this regard, we note that the administrative record indicates that registered voters in the City of San Diego twice rejected efforts to increase the transient occupancy tax—in both March and November 2004.

f.      *The landowner voting format outlined in section 53326, subdivision (c) of the Mello-Roos Act does not demonstrate the constitutional validity of the City's special tax election*

In seeking to uphold the special tax election in this case, the City does not provide *any* argument based on the text of the relevant constitutional provisions, their constitutional histories, or the intent of the voters in enacting these provisions. For the reasons described above, these traditional sources of constitutional interpretation overwhelmingly support the conclusion that the special tax election in this case was invalid because the City's registered voters were not permitted to vote in the election.

The City's sole theory that the special tax is constitutional is its contention that article XIII A, section 4 did not expressly "define or identify the qualified electors of the local government entities to which the two-thirds majority vote requirement applied" and that the term "qualified electors" is ambiguous. The City further contends that "[i]n the [Mello-Roos] Act, . . . four years after Proposition 13, the Legislature explicitly defined qualified electors for purposes of community facilities districts" (citing *San Francisco v. Industrial Acc. Com.*, *supra*, 183 Cal. at p. 279 [stating that courts ordinarily defer to Legislature's specification of a definition for an ambiguous constitutional term]). This is the *only* theory that the trial court provided in support of its conclusion that the special tax election met constitutional requirements. (See pt. II.D.3., *ante*.) We are not persuaded.

The term "qualified electors" (art. XIII A, § 4) is not ambiguous, for the reasons stated in part III.A.3.a., *ante*. We thus have no occasion to defer to the Legislature's

39

purported interpretation of the term "qualified electors" (art. XIII A, § 4) contained in the

Mello-Roos Act. Moreover, the Legislature's interpretation of Proposition 13 is found in

its *1979* enabling legislation of the proposition (§ 50075 et seq.), *not* in the *1986*

amendment of the Mello-Roos Act on which the City relies (§ 53326, subd. (c)).[30] In

*California Bldg. Industry Assn., supra,* 206 Cal.App.3d 212, the court explained that the

Legislature's contemporaneous construction of article XIII A, section 4 is found in

section 50075 et seq.:

> "Building Industry correctly argues that in [interpreting] article XIII A, section 4 . . . we should also apply the rule of construction which states that ambiguities in an enactment may be resolved by referring to the contemporaneous construction given to the enactment by the Legislature or by the administrative agency charged with implementing the enactment. [Citations] '[Where] a constitutional provision may well have either of two meanings, it is a fundamental rule of constitutional construction that, if the [L]egislature has by statute adopted one, its action in this respect is well nigh, if not completely, controlling.' (*San Francisco v. Industrial Acc. Com.*[, *supra*, 183 Cal. at p. 279] . . . .)
>
> "That rule has been expressly applied to article XIII A, section 4 by the *Richmond* [, *supra*, 31 Cal.3d 197] court . . . . [T]he court specifically stated that sections 50075 to 50077 were intended by the Legislature as enabling legislation for section 4. [Citation.] A review of the legislative history for these sections bears this out." (*California Bldg. Industry Assn.*, *supra*, 206 Cal.App.3d at p. 231.)

---

30    The City's assertion that section 53326, subdivision (c) was enacted "four years" after the 1978 passage of Proposition 13 is incorrect. Although the original version of the Mello-Roos Act was adopted in *1982* (Stats. 1982, ch. 1451, § 1), the provision on which the City relies in this case (§ 53326, subd. (c)), was not adopted until *1986*. (Stats. 1986, ch. 1102, § 19.)

The Legislature's Proposition 13 enabling legislation is fully consistent with the conclusion that article XIII A, section 4 requires that two-thirds of a district's *registered voters* approve a special tax. The Legislature entitled its enabling legislation, "*Voter-Approved Special Taxes*" (Stats. 1979, ch. 903, § 1, italics added) and included the following provision:

> "The legislative body of any city or county district may, following notice and public hearing, propose by ordinance the adoption of a special tax. The ordinance shall include the type of tax and rate of tax to be levied, the method of collection, and the dates upon which an election shall be held to approve the levy of such tax. Such proposition shall be submitted to *the voters* of the city or county, and, upon the approval of two-thirds of *the voters* voting upon such proposition, the city or county may levy the tax." (Former § 50077, subd. (a); Stats. 1979, ch. 903, § 1, italics added.)

Thus, the Legislature interpreted Proposition 13, as we do—to require the approval of two-thirds of a city's *voters* before a city may impose a special tax.

In any event, a consideration of the election provisions contained in the Mello-Roos Act does not persuade us that the special tax election in this case complied with article XIII A, section 4 and article XIII C, section 2, subdivision (d). As noted previously, section 53326, subdivision (a) provides that a local government shall submit the question of whether to levy a special tax to fund a community facilities district to the qualified electors of the proposed community facilities district, as follows:

> "(a) The legislative body shall then submit the levy of any special taxes to the qualified electors of the proposed community facilities district . . . ."

41

Section 53326, subdivision (b) in turn specifies that the qualified electors will ordinarily be either the registered voters of the proposed community facilities district, or in the case of a predominantly uninhabited proposed district, the landowners of the district:

> "(b) *Except as otherwise provided in subdivision (c)*, if at least 12 persons, who need not necessarily be the same 12 persons, have been registered to vote within the territory of the proposed community facilities district for each of the 90 days preceding the close of the protest hearing,[31] the vote shall be by the registered voters of the proposed district, with each voter having one vote. Otherwise, the vote shall be by the landowners of the proposed district and each person who is the owner of land at the close of the protest hearing, or the authorized representative thereof, shall have one vote for each acre or portion of an acre of land that he or she owns within the proposed community facilities district not exempt from the special tax." (Italics added.)[32]

Section 53326, subdivision (c), in turn, contains the exception referenced in section 53326, subdivision (b), stating that local governments may utilize a landowner voting format if the special tax will not be apportioned on residential property:

> "(c) If the proposed special tax will not be apportioned in any tax year on any portion of property in residential use in that tax year, as determined by the legislative body, the legislative body may provide that the vote shall be by the landowners of the proposed district

---

[31]    Section 53325 provides for a hearing to protest the formation of a proposed community facilities district.

[32]    This appeal does not require that we consider the distinct question of whether landowner voting to impose special taxes pursuant to section 53326, subdivision (b) is constitutional under article XIII A, section 4 and article XIII C, section 2, subdivision (d) in districts that lack sufficient registered voters to conduct an election among registered voters.

whose property would be subject to the tax if it were levied at the time of the election.  Each of these landowners shall have one vote for each acre, or portion thereof, that the landowner owns within the proposed district that would be subject to the proposed tax if it were levied at the time of the election."  (§ 53326, subd. (c).)

There is nothing in either the text or the legislative history of section 53326 subdivision (c) that indicates that in enacting this statute, the Legislature considered the meaning of "qualified electors" under article XIII A, section 4.[33]  Thus, there is no indication that the Legislature considered any of the numerous sources of constitutional

---

[33]     The parties do not rely on any of the legislative history of the statute in which the Legislature enacted section 53326, subdivision (c) in their briefing on appeal.  (Stats. 1986., ch. 1102, § 19.)  On our own motion, we take judicial notice of the following documents from this legislative history: Department of Finance, Enrolled Bill Report of Senate Bill No. 1115 (1985-1986 Reg. Sess.) dated August 29, 1986; Office of Local Government Affairs, Enrolled Bill Report of Senate Bill No. 1115 (1985-1986 Reg. Sess.) dated August 27, 1986; Assembly Local Government Committee, Third reading analysis of Senate Bill No. 1115  (1985-1986 Reg. Sess.) as amended August 14, 1986; Department of Finance, Review of Senate Bill No. 1115 (1985-1986 Reg. Sess.) as amended August 14, 1986; Assembly Local Government Committee, Republican Analysis of Senate Bill No. 1115 (1985-1986 Reg. Sess.) as amended August 14, 1986; Senate Rules Committee, Office of Senate Floor Analyses, Report on Senate Bill No. 1115 (1985-1986 Reg. Sess.) as amended August 14, 1986; Assembly Public Investments, Finance & Bonded Indebtedness Committee, Report on Senate Bill No. 1115 (1985-1986 Reg. Sess.) as amended June 17, 1986; Senate Rules Committee, Office of Senate Floor Analyses, Report on Senate Bill No. 1115 (1985-1986 Reg. Sess.) as amended January 28, 1986; Office of Local Government Affairs, Legislative Analysis of Senate Bill No. 1115 (1985-1986 Reg. Sess.) as amended January 28, 1986; Legislative Analyst, Analysis of Senate Bill No. 1115 (1985-1986 Reg. Sess.) as amended January 14, 1986; Department of Finance, Local Cost Estimate (1985-1986 Reg. Sess.) dated January 17, 1986; Senator Henry J. Mello, Fact Sheet–SB 1115 (1985-1986 Reg. Sess.) dated January 14, 1986; Department of Finance, Review of Senate Bill No. 1115 (1985-1986 Reg. Sess.) as amended January 14, 1986;  Senate Local Government Committee, Report on Senate Bill No. 1115 (1985-1986 Reg. Sess.) as amended January 14, 1986; Assembly Local Government Committee, Report on Senate Bill No. 1115 (1985-1986 Reg. Sess.) as amended January 28, 1985.

43

interpretation that we have cited that bear on this question. Further, there is no indication in either the text or the legislative history of section 53326, subdivision (c) that indicates that the Legislature considered whether a landowner election under section 53326, subdivision (c) constitutes a valid election of the "qualified electors" (art. XIII A, § 4).[34] Given these circumstances, we are unwilling to defer to a purported legislative interpretation of the meaning of "qualified electors" under article XIII A. (See *Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 180 [doctrine of deferring to legislative interpretation of a constitutional provision is "particularly appropriate when the Legislature has enacted a statute with the relevant constitutional prescriptions clearly in mind," citing *San Francisco v. Industrial Acc. Com., supra*, 183 Cal. at p. 279].)

In light of the fact that Proposition 13, section 4 "was intended to circumscribe the taxing power of local government" (*Rider, supra*, 1 Cal.4th at p. 6), the City's argument that we should *defer* to the Legislature's purported intent in enacting section 53326, subdivision (c) to afford *local governments* flexibility in complying with this state's *constitutional* mandate is less than compelling. In addition, according deference to this purported legislative intent would require that we interpret article XIII A, section 4 in a manner contrary to a decision of the Court of Appeal (*Neilson, supra*, 133 Cal.App.4th at

---

[34]    One committee report did pose the following question, in the "Comments" portion of the report: "Is it appropriate for residents of a Mello-Roos district to be unable to vote on the imposition of a proposed tax to be levied solely on nonresidential property, recognizing that they will not directly pay the tax, but will be impacted by the projects or services financed?" (Assem. Pub. Invest., Fin. & Bonded Indebtedness Com., Rep. on Sen. Bill No. 1115 (1985-1986 Reg. Sess.) as amended June 17, 1986, p. 4.) The report does not indicate that the committee considered the constitutionality of such a provision.

p. 1313) and an opinion of the Attorney General (66 Ops.Cal.Atty.Gen. 321, *supra*). We accord the interpretation of law found in these sources significant deference. (See *The MEGA Life and Health Ins. Co. v. Superior Court* (2009) 172 Cal.App.4th 1522, 1529 [" 'we ordinarily follow the decisions of other districts without good reason to disagree' "]; *County of Fresno, supra,* 204 Cal.App.3d at p. 427 [Attorney General opinions are given "great weight"].) Further, the interpretation that the City urges would also require us to disregard the Supreme Court's statement in *Greene, supra,* 49 Cal.4th at page 297, that elections pertaining to special taxes "do not permit property qualifications."

Even assuming that, in enacting section 53326, subdivision (c), the *Legislature* intended that local governments would be permitted to interpret the *constitutional* term "qualified electors" (art. XIII A, § 4) to refer to a narrow class of landowners and leaseholders, it is well established that "[a] statute cannot trump the Constitution." (*County of Los Angeles v. Commission on State Mandates* (2007) 150 Cal.App.4th 898, 904.) In light of the textual clarity of the constitutional provisions at stake, and the overwhelming interpretative evidence supporting the conclusion that the special tax election in this case was invalid because the City's registered voters were not permitted to vote in the election, we are obligated to effectuate the *voters*' intent in enacting Propositions 13 and 218, and strike down the tax.[35] (See *Greene*, *supra*, 49 Cal.4th at p.

---

[35]   It is undisputed that there are differences in the voting procedures specified in section 53326, subdivision (c) and the procedures utilized by the City in the Division. As

45

291 ["ultimate constitutional interpretation must rest, of course, with the judiciary (see *Marbury v. Madison* (1803) 5 U.S. (1 Cranch) 137, 176-180)"].)

Accordingly, we conclude that the City's special tax is invalid because it was not approved by a two-thirds vote of either the "qualified electors" (art. XIII A, § 4) or the "electorate" (art. XIII C, § 2, subd. (d)) of the City, as the California Constitution requires.

B.      *The City's special tax is invalid because it was not approved by a two-thirds vote of registered voters, as is required under the City Charter*

As an additional basis for reversing the judgment, appellants contend that the City's special tax is invalid because it was not approved by a two-thirds vote of the qualified electors of the City, as the City Charter requires.[36]  This claim turns on the proper interpretation of the City Charter, an issue that we review de novo.  (See, e.g., *City of Oakland v. Oakland Police and Fire Retirement System* (2014) 224 Cal.App.4th 210, 226, fn. 7 ["we will resolve this appeal through our de novo review of legal issues, such as the interpretation of the [Oakland City Charter]"]; *Conde v. City of San Diego*

---

the City states in its brief, "From the outset, the City acknowledged that the CCFD was not an exact replica of a community facilities district under the [Mello-Roos] Act."  For example, while section 53326, subdivision (c) provides for weighted voting based on ownership measured by acreage, the Division allocates votes on the basis of a Landowner's projected tax burden (see San Diego Mun. Code, § 61.2710, subd. (c)).  We assume, for purposes of this decision only, that these distinctions are, as the City contends, "not constitutionally material."

36      Because our resolution of appellants' claim under the City Charter provides an additional basis for reversing the trial court's judgment and our analysis of the two claims is highly related, we consider this claim notwithstanding our reversal of the judgment on state constitutional grounds.

(2005) 134 Cal.App.4th 346, 350 ["the interpretation of a city charter is reviewed de novo

on appeal"].)

1.      *The legal effect of the City Charter*

In *San Diego City Firefighters, Local 145 v. Board of Administration Etc.* (2012)

206 Cal.App.4th 594, 608, this court outlined the legal effect of the City Charter:

> " '[T]he charter represents the supreme law of the City, subject only
> to conflicting provisions in the federal and state Constitutions and to
> preemptive state law.  [Citation.]  . . .  "[T]he charter operates . . . as
> an instrument of *limitation and restriction* on the exercise of power
> over all municipal affairs which the city is assumed to possess . . . ."
> [Citations.]"  [Citations.]'  . . .  '[I]t is well settled that a charter city
> may not act in conflict with its charter.  [Citations.]  Any act that is
> violative of or not in compliance with the charter is void.  [Citation.]'
> [Citation.]  The provisions of the city's charter thus 'supersede all
> municipal laws, ordinances, rules or regulations inconsistent
> therewith' [citation] and 'an ordinance [or resolution] violative of or
> not in compliance with the city charter is void.'  (5 McQuillin, The
> Law of Municipal Corporations (3d ed.) § 15:17, p. 144.)"

2.      *Principles of interpretation*

"Generally, the same principles of construction applicable to statutes apply to the

interpretation of municipal charters.  [Citations.]  The courts must always look first to the

express language of the [law] to ascertain its meaning."  (*United Assn. of Journeymen v.

City and County of San Francisco* (1995) 32 Cal.App.4th 751, 760.)

47

3.      *Relevant provisions of the City Charter*

Section 6 of the City Charter provides:

"*Qualified Electors*

"The qualifications of an elector at any election held in the City under the provisions of this Charter shall be the same as those prescribed by the general law of the State for the qualification of electors at General State Elections.  No person shall be eligible to vote at such City election until he has conformed to the general State law governing the registration of voters."  (Italics added.)

City Charter section 76 provides in relevant part, "No special tax shall be permitted except as expressly authorized by this Charter."

Section 76.1 of the City Charter provides:

"Special Taxes

"Notwithstanding any provision of this Charter to the contrary, a special tax, as authorized by Article XIII A of the California Constitution may be levied by the Council only if the proposed levy has been approved by a two-thirds vote of the *qualified electors* of the City voting on the proposition; or if the special tax is to be levied upon less than the entire City, then the tax may be levied by the Council only if the proposed levy has been approved by a two-thirds vote of the *qualified electors* voting on the proposition in the area of the City in which the tax is to be levied."  (Italics added.)

4.      *"Qualified electors" for purposes of the City Charter are the City's registered voters*

Section 6 of the City Charter provides that the qualified electors for "any election held in the City" shall be those persons who are registered to vote under state law.  Thus, pursuant to section 6, "qualified electors" means registered voters.  Section 76.1, in turn, mandates that a special tax may be imposed only upon the approval of two-thirds of

48

"qualified electors." Reading sections 6 and 76.1 together, as we must,[37] sections 6 and 76.1 provide that the imposition of a special tax requires the approval of the registered voters in the City, or in the area of the City where the tax is to be levied.

The express reference to article XIII A and the use of the term "qualified electors" in the text of section 76.1 strongly support the conclusion that the provision should be interpreted consistently with article XIII A, section 4 to require an election by registered voters. (See *Mason v. Retirement Board* (2003) 111 Cal.App.4th 1221, 1229 ["We do not interpret . . . charter provisions . . . in isolation," and stating that courts must interpret a charter provision " ' "with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness" ' "].)

The voter information pamphlet from the election at which the City's voters enacted section 76.1 supports this conclusion,[38] stating in relevant part:

> "The California State Constitution presently allows *voters* in a city or community to approve, by a two-thirds vote, special tax levies for desired additional improvements or services.
>
> "[¶] . . . . [¶]

---

[37]    (See, e.g., *Creighton v. City of Santa Monica* (1984) 160 Cal.App.3d 1011, 1017 ["the various sections of a charter must be construed together, giving effect and meaning so far as possible to all parts thereof, with the primary purpose of harmonizing them and effectuating the legislative intent as therein expressed"].)

[38]    "Courts may assume the ballot materials reflected the voters' intent in passing the . . . charter." (*Howard Jarvis Taxpayers Assn. v. County of Orange, supra,* 110 Cal.App.4th at p. 1386.)

"This concept is already permitted by our State Constitution and is entirely consistent with the 1978 Jarvis-Gann Initiative (Proposition 13), which enjoyed widespread voter approval. The remaining step needed to permit communities in San Diego to take advantage of this technique is an enabling amendment to City Charter section 76." (City of San Diego Sample Ballot & Voter Information Pamp., General Mun. Elec., Tuesday Nov, 8, 1983, argument in favor of Prop. B., italics added.)[39]

None of the arguments that the City makes in support of its claim that section 76.1 does not require a vote of registered voters is persuasive. The City's primary argument is that section 6's express definition of "qualified electors" does not apply to the "qualified electors" referred to in section 76.1 because the first clause of section 76.1 provides, "Notwithstanding any provision of this charter to the contrary . . . ." In this regard, the City argues, "As [the] language states, section 6 (or any other provision) does not control with respect to special taxes." The City's reading of the "notwithstanding" clause is unpersuasive. The *definition* of qualified electors set forth in section 6 is *not* contrary to any provision in section 76.1. Rather, section 6 provides a definition of a term that is not otherwise expressly defined in section 76.1.[40] In any event, even assuming that the definition of "qualified electors" provided in section 6 did not apply, for the reasons

---

[39]     On our own motion, we take judicial notice of the pamphlet. (See *PG&E Corp. v. Public Utilities Com., supra,* 118 Cal.App.4th at p. 1204, fn. 25.)

[40]     The "notwithstanding" clause is most reasonably interpreted as referring to other provisions concerning *special taxes* contained in the City Charter. (See City Charter, §§ 77a, 77b [authorizing special taxes related to zoological exhibits and public transportation].)

50

stated above, we would interpret "qualified electors" in section 76.1, in a manner consistent with article XIII A, section 4, to mean registered voters.

The City also contends that the special tax in this case is governed by the last clause of section 76.1, which applies when a "special tax is to be levied upon less than the entire City."  We have serious doubts as to whether a special tax that will be levied upon all parcels in the City that are, or will be, used for a hotel,[41] may be deemed to be a tax levied upon less than the entire City within the meaning of section 76.1.  Even assuming that a noncontiguous special district could be considered an "area less than the entire City" under section 76.1, it is unclear, at best, whether this portion of section 76.1 would permit the qualified electors in an "area less than the entire City" to authorize the potential imposition of a tax on *any* parcel within the City, whenever any such parcel becomes used as a hotel in the future.  In any event, even with respect to tax levies that are geographically limited, section 76.1 requires a vote of "qualified electors," which we have interpreted to mean registered voters.  Thus, even assuming that the final clause of section 76.1 applies, the City's special tax election violated the City Charter because the

---

[41]    The Division makes clear that the special tax applies to parcels of property that are used for hotel purposes beginning after the date of the City's special tax election by stating, "Whenever a parcel of property within a convention center facilities district formed pursuant to this Division begins to be used as a *Hotel,* either for the first time or after a period of time when it was not so used, that property shall thereupon become subject to the special tax."  (San Diego Mun. Code, § 61.2711(b).)

51

City identified *Landowners*, rather than registered voters, as the "qualified electors" who would be permitted to vote in the election.[42]

Accordingly, we conclude that the City's special tax is invalid because it was not approved by a two-thirds vote of registered voters, as is required under the City Charter.

IV.

CONCLUSION

In *Rider*, in ruling that a local government's attempt to fund new courtrooms and jails violated the special tax election procedures mandated by Proposition 13, the Supreme Court concluded its opinion with the following remarks:

> "We are sympathetic to the plight of local government in attempting to deal with the ever-increasing demands for revenue in the post-Proposition 13 period. . . . Yet Proposition 13 and its limitations on local taxation are constitutional mandates of the people which we are sworn to uphold and enforce." (*Rider, supra*, 1 Cal.4th at p. 16.)

Similarly, in this case, while we understand that the City would like to expand the convention center, we are duty bound to uphold the provisions of the California

---

[42] The City also contends that to interpret the City Charter as mandating a vote by registered voters would mean that "every community facilities district existing within the City involving a landowner vote (e.g. Mello-Roos districts established under the [Mello-Roos] Act were unlawfully formed, and the special taxes levied and bonds issued in reliance on the landowner election are invalid." We are not persuaded by this contention. It is clear that the validity of any previously levied taxes and previously issued bonds are not before this court. Further, as we stated with respect to the City's arguments concerning the Mello-Roos Act made in connection with the state Constitution, this appeal does not require that we consider the validity of landowner voting to impose special taxes pursuant to section 53326, subdivision (b).

Constitution and the City Charter that require that the City's *registered voters* approve the special tax at issue in the case.

V.

DISPOSITION

The judgment is reversed. The matter is remanded to the trial court with directions to enter judgment in favor of appellants and to conduct any further necessary ancillary proceedings that are consistent with this opinion. Appellants are entitled to costs on appeal.

AARON, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.